UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARK THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| TOWN OF SALISBURY, DAVID J. L'ESPERANCE, | ) | CIVIL ACTION |
| CORNELIUS J. HARRINGTON, KEVIN SULLIVAN, | ) | NO. 14-13726-JGD |
| ROBERT ST. PIERRE, DANIEL MCNEIL, | ) | |
| RICHARD MERRILL JR., EUGENE SCIONE, | ) | |
| STEVEN SFORZA, MICHAEL ADLER and | ) | |
| THOMAS FOWLER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON TOWN DEFENDANTS' MOTION TO DISMISS

September 28, 2015

DEIN, U.S.M.J.

### I.  INTRODUCTION

The plaintiff, Mark Thomas, is a police officer with the Town of Salisbury.  He has

brought this action alleging numerous violations of his constitutional and state law rights in

connection with an internal investigation brought against him, his resulting termination as a

police officer, and his subsequent reinstatement.  The defendants fall into three groups, each of

whom have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  They include the Town

of Salisbury and the Town Manager, Cornelius (Neil) Harrington (collectively the "Town Defen-

dants"), and the "Individual Defendants," which group includes police officers Richard Merrill,

Jr., Eugene Scione, Steven Sforza and Michael Alder; Robert St. Pierre (the former Chief of the

Salem Police Department who conducted the investigation); and Thomas Fowler (the current

Chief of the Salisbury Police Department).  The final group, collectively referred to as the

"L'Esperance Defendants," includes David J. L'Esperance (the former Salisbury Chief of Police);

Kevin Sullivan (the former Salisbury Acting Chief of Police); and Daniel McNeil (a retired

Sergeant from the Salisbury Police Department).

 This matter is presently before the court on the Town Defendants' Motion to Dismiss all

the remaining counts of the complaint against them.  (Docket No. 21).  These include Count I

(violation of First Amendment Rights – Retaliation), Count II (violation of Fourteenth Amen-

dment – Procedural Due Process), Count III (violation of Fourteenth Amendment – Substantive

Due Process), Count IV (violation of Fourteenth Amendment – Defamation), Count V (civil

conspiracy against Harrington), Count VII (violation of Mass. Gen. Laws. ch. 12, § 11I - The

Massachusetts Civil Rights Act against Harrington), Count VIII (intentional infliction of emotional

distress against Harrington), Count IX (intentional interference with contractual relations

against Harrington), Count X (interference with advantageous business relations against

Harrington), and Count XI (defamation against Harrington).  The plaintiff has voluntarily with-

drawn Count XII (violation of Mass. Gen. Laws ch. 149, § 185 Whistleblower Statute against the

Town).  For the reasons detailed herein, the motion to dismiss is ALLOWED as to Counts II, III, IV

and XI, and DENIED as to Counts I, V, VII, VIII, IX and X.

## II.  STATEMENT OF FACTS

 When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court

must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable

[2]

inferences.  See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).  Applying this

principle, the relevant facts are as follows.

Thomas has been a police officer with the Town of Salisbury since the 1980's.  (Compl.

(Docket No. 1) ¶¶ 16, 19).  He is also an attorney.  (Id. ¶ 23).  As a police officer, Thomas is a

member of the New England Police Benevolent Association ("NEPBA" or the "Union"), which

has a collective bargaining agreement ("CBA") with the Town.  (Id. ¶ 3).  It is undisputed that

Article 8 of the CBA provides that "police officers are not to be removed, dismissed, discharged

or suspended in any manner except for just cause."  (Town Mem. (Docket No. 22) at 2).  Until

the events at issue here, Thomas was an officer in good standing, and had been the recipient of

numerous accolades in connection with his law enforcement work.  (Compl. ¶¶ 20-25).  He

worked well under a number of Chiefs, including, for a while, the defendant David L'Esperance.

(Id. ¶¶ 19, 24-28).  As Thomas alleges, based upon his "career achievements and credentials, up

until 2011, it was clear that he was on the fast track to rise through the ranks of the SPD

[Salisbury Police Department] and to the pinnacle of his profession."  (Id. ¶ 29).

### The Investigation of L'Esperance

In or about April 2006, L'Esperance was selected as Salisbury's new Police Chief.  (Id.

¶ 33).  According to the plaintiff, L'Esperance was the choice of Harrington, the Town Manager.

(Id. ¶¶ 33-34).  Thomas contends that he worked well with L'Esperance until about 2009, as

described below.  (See id. ¶¶ 35-87).  During the time period between 2006 and 2009, Thomas

reported to L'Esperance what he believed to be inappropriate behavior on the part of various

police officers, in particular the defendant Alder, who was also an officer of the NEPBA, and the

[3]

defendant Sullivan, who allegedly displayed a great deal of animosity toward Thomas.  (Id. ¶¶ 41-60).

A number of officers and others were dissatisfied with the tenure of L'Esperance as Police Chief, and a vote of "no confidence" was taken by the Union on or about February 4, 2009.  (Id. ¶¶ 78-81).  When L'Esperance learned that Thomas was among those who had not supported him, L'Esperance became extremely upset and declined to promote Thomas to acting-Sergeant, despite previous promises to do so.  (Id. ¶¶ 84-87).  Due to various allegations of wrongdoing on the part of L'Esperance, L'Esperance was placed on paid administrative leave on or about December 5, 2010, and eventually resigned on January 18, 2011.  (Id. nn.1 & 2). The defendant Sullivan became the Acting Chief.  (Id. ¶ 88).

According to Thomas, Harrington independently authorized an investigation into the allegations against L'Esperance, and hired defendant Robert St. Pierre to conduct the investigation.  (Id. n.3).  Thomas alleges that St. Pierre, the former Chief of the Salem Police Department, was a long-time friend of Harrington, and that his hiring was improper for a number of reasons, including the fact that the Board of Selectmen had not given permission to conduct the investigation.  (Id. ¶¶ 101-09).  Moreover, the decision to proceed with St. Pierre was allegedly done so that Harrington would be protected from exposure and could direct the investigation.  (Id. ¶ 105).  According to Thomas, while L'Esperance was the focus of the investigation, the plaintiff, too, was a "target" from the outset.  (Id. ¶¶ 122-27).

[4]

**The Investigation of Thomas**

On January 24, 2011, St. Pierre issued a report (the "L'Esperance Report"), which detailed serious violations of state law and the Police Department's Code of Conduct on the part of L'Esperance.  (Id. n.3).  The L'Esperance Report also contained allegations concerning Thomas, and Harrington independently authorized St. Pierre to begin a new investigation of Thomas in late February 2011.  (Id.).  According to Thomas, during the period of his investigation, then Acting Chief Sullivan, along with other police officers, "continued, on a daily basis, attacking Thomas, trying to ruin his reputation."  (Id. ¶ 99).

On or about February 23, 2011, about a month after the issuance of the L'Esperance Report charging Thomas with wrongdoing, and shortly before his own investigation began, the plaintiff filed what he has characterized as a "whistle blowing" letter with the then-Chairman of the Board of Selectmen, Donald Beaulieu, and with Harrington.  (Id. ¶¶ 111-12).  Therein, Thomas alleged that Acting Chief Sullivan had sexually harassed female dispatchers working with the Police Department.  (Id. ¶¶ 111-12, 114).  Thomas subsequently learned that Harrington had been made aware of these charges by Police Officer McNeil earlier, but that the two men had decided to cover it up so as to avoid further humiliation or embarrassment for Salisbury.  (Id. ¶¶ 113-16).  Harrington allegedly rewarded McNeil by promoting him to Sergeant, a position that Thomas was already slated to fill.  (Id. ¶ 116).

Thomas was placed on administrative leave on May 25, 2011 while his investigation was pursued.  (Id. n.8).  Thomas alleges that because of jealousy and personal animosity, many SPD employees submitted false and defamatory statements to St. Pierre about him.  (Id. ¶¶ 129-54).

[5]

Sullivan was allegedly an instigator of the negative information provided, and St. Pierre was allegedly biased against Thomas and would coach witnesses to provide negative information. (Id.).  There are no allegations that Harrington provided any information in the investigation, although Thomas alleges that Harrington was kept "apprised of the investigation during its pendency" by St. Pierre.  (Id. ¶ 158).  The events surrounding this investigation of Thomas, and his subsequent exoneration, form the principal bases of his claims of wrongdoing in this case.

On or about September 1, 2011, St. Pierre issued a report (the "Thomas Report"), which was mailed to Thomas on September 28, 2011.  (Town Mem. at 3; Compl. ¶ 155).  In the report, St. Pierre found that there were grounds to discharge Thomas, namely: (1) that during the period October 1, 2007 through March 1, 2008, Thomas studied for the Bar Exam while on duty as a police officer, and (2) that Thomas knowingly allowed "then-Chief David L'Esperance to submit false information concerning [the plaintiff's] work history, including but not limited to the position [he] held and as to disciplinary action that had been taken against [him,]" in order to gain admission to the FBI National Academy.  (Compl. Ex. 1 at 1).  Thomas contends that these charges are patently false.

Meanwhile, in response to Thomas' complaint about Sullivan, Harrington had again hired St. Pierre who, in turn, had hired Police Lt. Mary Butler of the Salem Police Department to assist in a new investigation.  (Id. ¶¶ 117-20).  Lt. Butler found the charges against Sullivan to be substantiated.  (Id. ¶¶ 119-20).  Sullivan resigned, or was relieved of his duties, on March 1, 2011.  (Id. n.4; Town Mem. at 3).  Defendant Thomas Fowler was subsequently appointed Chief.

[6]

(Compl. ¶ 180 & n.12).  Lt. Butler issued her report about Sullivan in early May 2011.  (Town

Mem. at 3).

### Thomas' Disciplinary Proceedings

After the Thomas Report issued, Thomas was given written notice that a disciplinary

hearing was going to be held pursuant to Mass. Gen. Laws ch. 31, §§ 41-45.  (Compl. ¶ 156).

Harrington presided over the hearing on February 1, 2012, at which Thomas was represented

by counsel from the Union.  (Id. ¶ 157; Town Mem. at 3).  Town counsel submitted the Thomas

Report and rested.  (Compl. ¶ 157).  Thomas complains that he was not given discovery prior to

the hearing.  (Id. ¶ 159).  On February 8, 2012, Thomas' employment with the SPD was

terminated.  (Id. ¶ 160).

Thomas contends that the Union initially refused to honor his request to file a grievance,

although it is undisputed that a grievance challenging his termination was eventually filed on

his behalf.  (Id. ¶¶ 162-64).  The matter was not resolved at the grievance stage, however.

Therefore, in accordance with the CBA, Thomas requested and obtained an arbitration hearing.

(Id. ¶ 167).  Since he was dissatisfied with the qualifications of the attorney provided to him by

the Union, he hired his own counsel who represented him at the arbitration.  (Id. ¶¶ 166-67).

Hearings were held on June 27, 2012 and July 13, 2012.  (Id. ¶¶ 168-70).  On October 31, 2012,

the arbitrator issued written findings, "which concluded that Thomas committed no wrong-

doing, completely exonerating him."  (Id. ¶ 172).  The arbitrator ordered that Thomas be

reinstated with back pay, and the Town did not appeal the decision.  (Id. ¶¶ 173-74).  Thomas

claims that he has not been paid all the amounts to which he is entitled and has not been returned to the appropriate rank or shift.  (Id. ¶¶ 176-79).

According to the plaintiff, "[a]fter his re-instatement to the SPD on or about November 30, 2012, Thomas became the target of numerous retaliatory acts orchestrated by Harrington and the new SPD police chief, Fowler."  (Id. ¶ 180).  Specifically, but without limitation, Fowler allegedly unilaterally changed the SPD policy and/or rules to preclude police officers from practicing law.  (Id. ¶ 186).  In addition, Thomas was allegedly the "target of an investigation into his residency[,]" which went nowhere, as he has always maintained a primary residence in Salisbury.  (Id. ¶ 193).  Other actions resulted in Thomas filing a number of grievances, several of which remained pending as of the time Thomas filed the instant complaint.  (Id. ¶ 192).

On February 21, 2014, Thomas' counsel sent a demand letter setting forth the allegedly wrongful acts committed against Thomas to the Board of Selectmen, Harrington and then Chief Fowler.  (Id. ¶¶ 197-98).  Thomas was placed on paid administrative leave on March 28, 2014 following a complaint to Fowler that he felt fearful at work.  (Id. ¶ 200; Town Mem. at 4).  This was subsequently changed to sick leave in accordance with a letter Chief Fowler received from Thomas' healthcare provider.  (Town Mem. at 4).  On September 5, 2014, Thomas filed a written request with Fowler for injured on duty benefits under Mass. Gen. Laws ch. 41, § 111F. (Compl. ¶ 201).  Thomas alleges that as a result of the defendants' conduct, he has suffered severe emotional and physical distress.  (Id. ¶¶ 202-13).

Additional facts will be provided below as appropriate.

[8]

### III.   ANALYSIS

**A.   Standard of Review**

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  Cooperman, 171 F.3d at 46.  Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane." Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted). This second step requires the reviewing court to "draw on its judicial experience and common sense." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Morales-Cruz, 676 F.3d at 224 (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)).

Applying this standard, the Town Defendants' motion to dismiss must be allowed in part and denied in part as detailed herein.

**B.      Count I – Violation of First Amendment Rights – Retaliation**

Count I of the complaint is brought against the Town of Salisbury, Harrington and Fowler.  Therein, Thomas alleges that "Salisbury, by and through Harrington (an authorized decision maker for the municipality), violated Thomas' First Amendment rights when he retaliated against him for exposing and disclosing to Harrington (via oral and written communications) the criminal activities of Sullivan, which included allegations of sexual assault."  (Compl. ¶ 215). He further alleges that the retaliatory conduct included subjecting Thomas to a flawed and unauthorized investigation (id. ¶ 216), and ordering Thomas to cease the practice of law while at the same time allowing other police officers to continue with other law enforcement related jobs outside their employment as Salisbury police officers.  (Id. ¶ 220).  The defendants have moved to dismiss this claim on various grounds, including on the grounds that the speech was not protected, the claim is time-barred, and it fails to state a claim of municipal liability against the Town.  For the reasons detailed herein, this court finds that Thomas has stated a claim, and the motion to dismiss Count I is denied.

**Thomas' Speech is Protected Under the First Amendment**

"It is well settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.'"  Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quoting Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25-26 (1st Cir. 2010)) (additional citation omitted).  In the public employment context,

however, this right is not unlimited.  As the Supreme Court explained in Garcetti v. Cellabos,

547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006), "[w]hen a citizen enters

government service, the citizen by necessity must accept certain limitations on his or her

freedom."  This is because

> [g]overnment employers, like private employers, need a significant
> degree of control over their employees' words and actions; without it,
> there would be little chance for the efficient provision of public services.
> Public employees, moreover, often occupy trusted positions in society.
> When they speak out, they can express views that contravene govern-
> mental policies or impair the proper performance of governmental
> functions.

Garcetti, 547 U.S. at 418-19, 126 S. Ct. at 1958 (internal citation omitted).  Consequently, "a

governmental employer may impose certain restraints on the speech of its employees,

restraints that would be unconstitutional if applied to the general public."  Davignon v.

Hodgson, 524 F.3d 91, 100 (1st Cir. 2008) (quoting City of San Diego v. Roe, 543 U.S. 77, 80, 125

S. Ct. 521, 523, 160 L. Ed. 2d 410 (2004)) (alteration omitted).

In accordance with the guidance set forth by the Supreme Court, including the Court's

discussion in Garcetti, the First Circuit has established the following three-part test for

determining whether an adverse employment action violates a public employee's right of free

speech:

> First, a court must determine "'whether the employee spoke as a citizen
> on a matter of public concern.'"  Curran v. Cousins, 509 F.3d 36, 45 (1st
> Cir. 2007) (quoting Garcetti, 547 U.S. at 418, 126 S. Ct. 1951).  Second,
> the court must "balance ... the interests of the [employee], as a citizen, in
> commenting upon matters of public concern and the interest of the
> State, as an employer, in promoting the efficiency of the public services it
> performs through its employees."  Id. at 44 (quoting Pickering v. Bd. of
> Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)) (omission

in original).  Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision."  *Id.* at 45.

Decotiis, 635 F.3d at 29.  In the event all three elements of the test "are resolved in favor of the plaintiff, the employer may still escape liability if it can show that 'it would have reached the same decision even absent the protected conduct.'"  Id. at 29-30 (quoting Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 765-66 (1st Cir. 2010)).

In the instant case, the defendants have moved to dismiss this claim on the grounds that, even assuming that Thomas was speaking on a matter of public concern, he was not speaking as a private citizen.  This court does not agree.

As an initial matter, Thomas' speaking out about Sullivan's conduct in sexually harassing female employees was on a subject of public concern.  Azzaro v. Cty. of Allegheny, 110 F.3d 968, 978-79 (3d Cir. 1997) (report of sexual harassment by person in authority was on a matter of public concern).  In fact, such disclosures "are precisely the type of communications that demand strong First Amendment protection."  Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 224 (D. Mass. 2002) (statements "regarding corruption and racism within the Holyoke police department *were* on matters of public concern."), aff'd on other grounds, 362 F.3d 1 (1st Cir. 2004).  Therefore, this court must determine whether Thomas was acting as a private citizen when he made his complaint to the Town Manager and Chairman of the Board of Selectmen.

"In *Garcetti*, the Supreme Court held that public employees do not speak as citizens when they 'make statements pursuant to their official duties,' and that accordingly, such speech is not protected by the First Amendment."  Decotiis, 635 F.3d at 30 (quoting Garcetti,

[12]

547 U.S. at 421, 126 S. Ct. at 1960).  However, the Supreme Court has since clarified that the

mere fact that an individual's speech "relates to public employment" or "concerns information

acquired by virtue of his public employment does not transform that speech into employee –

rather than citizen – speech."  Lane v. Franks, 134 S. Ct. 2369, 2379, 189 L. Ed. 2d 312 (2014).

Instead, as the Court explained, "[t]he critical question under *Garcetti* is whether the speech at

issue is itself ordinarily within the scope of an employee's duties, not whether it merely

concerns those duties."  Id.

    In order to determine whether Thomas' speech was made pursuant to his ordinary

responsibilities as a police officer, this court "must take a hard look at the context of the

speech."  Decotiis, 635 F.3d at 32.  Although the First Circuit has emphasized that "no one

contextual factor is dispositive," it has set forth a list of non-exclusive factors to guide courts in

their evaluation.  Id.  Those factors include:

> whether the employee was commissioned or paid to make the speech in
> question; the subject matter of the speech; whether the speech was
> made up the chain of command; whether the employee spoke at her
> place of employment; whether the speech gave objective observers the
> impression that the employee represented the employer when she spoke
> (lending it "official significance"); whether the employee's speech derived
> from special knowledge obtained during the course of her employment;
> and whether there is a so-called citizen analogue to the speech.

Id. (internal citations omitted).  Ultimately, however, "the proper inquiry is practical rather than

formal, focusing on the duties an employee actually is expected to perform, and not merely

those formally listed in the employee's job description."  Id. at 31 (quotations and citations

omitted).

[13]

At this stage, viewing the evidence most favorable to the plaintiff, this court concludes that Thomas must be viewed as having spoken as a citizen, and not in his capacity as a police officer.  There does not seem to be any part of his job responsibilities that call for him to monitor whether there was sexual harassment on the job.  He did not file his whistleblower letter in the context of the union grievance procedure, nor did he file a complaint with his superior officers.  Rather, Thomas went outside the SPD to the Board of Selectmen and Town Manager, persons to whom members of the public also would have access.  At this stage, the record does not support the contention that the whistle-blower letter was made as part of Thomas' job responsibilities.

The cases relied on by the defendants are easily distinguishable.  For example, in Perkins v. City of Attleboro, 969 F. Supp. 2d 158 (D. Mass. 2013), a Captain of the Fire Department wrote a letter to the union president in furtherance of his role as a union member, which related to the management of the Fire Department.  Id. at 173.  Not only was the subject matter of the letter relevant to his job responsibilities as Captain, but the fact that he limited his complaint to the union president, and did not disseminate it to a public forum, also led the court to conclude that he was acting pursuant to his official duties, and not as a private citizen. Id.  In the instant case, however, there is nothing in the record which indicates that reporting incidences of sexual harassment were part of Thomas' job responsibilities.  Moreover, the alleged facts show that he made his complaint to public officials.  Therefore, the complaint supports the conclusion that Thomas was acting as a private citizen.

Oberg v. City of Taunton, 972 F. Supp. 2d 174 (D. Mass. 2013), is similarly distinguish-

able.  There, the court held that statements made by a Chief of Police, which related to his job

responsibilities, *i.e.*, the investigation of a probationary patrolman, which were made by the

plaintiff in his capacity as a representative of the police department, were "not protected

because the subject matter of the speech was entirely within Plaintiff's official duties."  Id. at

196.  Here, in contrast, there is no indication that Thomas was speaking about anything within

the scope of his job responsibilities, and he made the statements at issue to public, rather than

SPD, officials.  This is sufficient to find that he was speaking as a citizen at the time in question,

and that his speech is protected by the First Amendment.  Count I will not be dismissed on this

basis.[1]

### Statute of Limitations

In Massachusetts, claims brought under § 1983 are subject to a three year statute of

limitations.  Nieves v. McSweeney, 241 F.3d 46, 51 (1st Cir. 2001).  The instant action was filed

on September 29, 2014.  The defendants argue that since the investigation against Thomas

commenced in February 2011, and Thomas himself was interviewed between May and July

2011, "the alleged retaliatory conduct attributed to Harrington occurred beyond the three-year

limitations period and cannot form the basis of any First Amendment-retaliation claim against

him." (Town Mem. at 6).  As Thomas argues, however, his "retaliatory termination" in February

---

[1]  Since the defendants limited their Garcetti challenge to an argument that the plaintiff was not
speaking as a citizen, the court will not address the other elements of a First Amendment retaliation
claim at this time.

2012 "is the actual injury on which Plaintiff's claim rests." (Pl. Opp. (Docket No. 29) at 11).

Harrington presided over the hearing that resulted in the termination of Thomas' employment.

(Compl. ¶ 157). Accordingly, any claims arising out of his termination were clearly filed within

the statutory period and are not time-barred. See Marrero-Gutierrez v. Molina, 491 F.3d 1, 5

(1st Cir. 2007) (the first step in a timeliness argument "is to determine the actual injury on

which the plaintiff rests the cause of action."). While further development of the record may

establish that parts of the plaintiff's First Amendment claims are time-barred, Count I will not

be dismissed on statute of limitations grounds at this stage.

**Municipal Liability**

The Town has also moved to dismiss Count I on the grounds that the plaintiff has failed

to plead sufficient facts to establish municipal liability. "It is well established that a municipality

is not liable for the tortious actions of its employees simply by virtue of the employment

relationship." Oberg, 972 F. Supp. 2d at 192 (citing Bd. of Cnty. Comm'rs v. Brown, 520 U.S.

397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997); Monell v. Dep't of Soc. Servs., 436 U.S. 658,

691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st

Cir. 2013)). "Instead, to establish municipal liability, 'the execution of a municipal policy or

custom' must be 'the cause of the relevant injury.'" Oberg, 972 F. Supp. 2d at 192 (quoting

DiRico v. City of Quincy, 404 F.3d 464, 468 n.12 (1st Cir. 2005)). "The municipal policy may

either be (1) an official policy articulated or adopted by a decisionmaker or (2) an unofficial

custom as evidenced by widespread action or inaction." Oberg, 972 F. Supp. 2d at 192. Here,

the Town seeks to dismiss Count I on the grounds that the plaintiff has failed to plead the

[16]

existence of a policy or custom that caused the plaintiff's alleged civil rights violation.  See

Tomaselli v. Beaulieu, 967 F. Supp. 2d 423, 444 n.10 (D. Mass. 2013), and cases cited.  This

court, finds, however, that this argument is premised on too narrow a reading of the complaint.

In the instant case, Thomas is proceeding on "a 'final authority' theory of municipal

liability."  Freeman, 714 F.3d at 38.  "A single decision by a municipal policymaker" may consti-

tute an official policy "only where the decisionmaker possesses final authority to establish

municipal policy with respect to the action ordered."  Id. (quoting Pembaur v. City of Cincinnati,

475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).  "When determining whether a

decisionmaker exercises final authority, '[c]ourts must look to state law, including "valid local

ordinances and regulations," for descriptions of the duties and obligations of putative policy-

makers in the relevant area at issue.'"  Id. (quoting Walden v. City of Providence, 596 F.3d 38,

56 (1st Cir. 2010)) (additional citations omitted).  Here, Thomas has alleged that Harrington was

the appointing authority for the Town regarding civil service employees.  (Compl. ¶ 61).  Thus,

he argues, the Town is liable for the allegedly "illegal termination of Thomas by Harrington (the

Salisbury official charged with final authority to terminate civil service employees) . . . . Quite

simply, Harrington's actions require the imposition of municipal liability on Salisbury as the

termination of Thomas was undertaken by a 'municipal policy maker' and meant to silence

Thomas."  (Pl. Opp. at 11).  These allegations are sufficient at this juncture to show that

Harrington had policymaking authority, and the claim against the Town will not be dismissed on

this basis.  See Oberg, 972 F. Supp. 2d at 193 ("Given that the City Council had the power to call

an executive session and failed to do so, serves as the disciplinary body for the City, and voted

[17]

to place Plaintiff on administrative leave, Plaintiff has pleaded sufficient information at this juncture to plausibly conclude the City Council had policymaking authority in this area.").

In sum, at this stage, the plaintiff has stated a claim for retaliation in violation of his First Amendment rights.  The motion to dismiss Count I of the complaint is denied.

### C.  Count II – Violation of Fourteenth Amendment – Procedural Due Process

In Count II of his complaint, Thomas alleges that his procedural due process rights were violated when Harrington, without authority, selected St. Pierre to conduct the investigation of him, and St. Pierre conducted an allegedly flawed investigation which led to his termination. (Compl. ¶¶ 223-26).  Thus, Thomas contends, the Town and Harrington "violated Thomas' due process rights as a fair and open procedure based upon an unbiased investigation would have cleared Thomas." (Id. ¶ 227).  In light of the undisputedly adequate post-termination proceedings that were available to Thomas, this claim of procedural due process must fail. Count II will be dismissed.

"To maintain a procedural due process claim, a plaintiff must allege that the plaintiff was deprived of constitutionally protected property because of defendants' actions, and that the deprivation occurred without due process of law." Senra v. Town of Smithfield, 715 F.3d 34, 38 (1st Cir. 2013) (internal punctuation and quotation omitted).  Here, the defendants agree that Thomas' termination resulted in the deprivation of constitutionally protected property, *i.e.*, his continued employment.  (Town Mem. at 9).  Therefore, the relevant inquiry is whether he was deprived of his employment "without the minimum amount of process that was due

under the Constitution including some kind of hearing and some pretermination opportunity to respond." Senra, 715 F.3d at 38-39 (internal punctuation and quotation omitted).

"Pre-termination and post-termination proceedings are not evaluated for constitutional adequacy in isolation from each other; a reviewing court studies the totality of the process received in light of the factual record to determine if the procedural due process was suffi-cient." Id. at 39. In the instant case, Thomas admits that he was provided a pre-termination hearing and opportunity to be heard, but challenges the sufficiency of those proceedings because St. Pierre and Harrington were allegedly biased against him. Thus "[i]n invoking his procedural due process claims, [Thomas] does not seriously argue that the established state pre-termination procedures are deficient. Rather, [Thomas'] claims rest on alleged random and unauthorized acts by Town defendants." Cronin v. Town of Amesbury, 81 F.3d 257, 260 n.2 (1st Cir. 1996) (plaintiff argues that the Town defendants "were out to get him" and were biased against him). Nevertheless, even assuming, *arguendo*, that Thomas' pre-termination proceedings were constitutionally inadequate, Thomas "cannot succeed on his procedural due process claim unless he can show that the state failed to provide him with an adequate postdeprivation remedy." Id. at 260. Because Massachusetts makes such remedies available, Thomas has not met this burden.

It is well-established that procedures under Massachusetts law, which provide for administrative and judicial review of a termination decision, satisfy Constitutional due process requirements. See Hadfield v. McDonough, 407 F.3d 11, 21 (1st Cir. 2005), and cases cited. "The basic guarantee of procedural due process is that, 'before a significant deprivation of

[19]

liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner.'" Perkins, 969 F. Supp. 2d at 176 (quoting Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011)) (additional punctuation and citations omitted).  In the instant case, "the procedural due process given to [Thomas], which included a pre-deprivation hearing with notice and union representation at the hearing," followed by "the post-termination arbitration proceeding, where [Thomas] was represented by counsel and was able to participate and to present evidence to a neutral arbiter, satisfied [Thomas'] rights to procedural due process."  Senra, 715 F.3d at 40.  Accordingly, Count II of Thomas' complaint will be dismissed.

### D.      Count III – Violation of Fourteenth Amendment – Substantive Due Process

In Count III of his complaint, Thomas alleges that the defendants violated his substantive due process rights.  While the parties agree on the standard to be applied, they differ as to whether the allegations of the complaint are sufficient to establish the "conscience-shocking behavior" necessary to sustain such a claim.  See Estate of Bennett v. Wainwright, 548 F.3d 155, 162 (1st Cir. 2008).  A claim of violation of substantive due process rights is sustainable in a very limited number of circumstances.  For the reasons detailed herein, this court finds that Thomas has not pleaded sufficient facts, and Count III will be dismissed.

> Substantive due process is a constitutional cause of action that leaves the door "slightly a jar for federal relief in truly horrendous situations." *Néstor Colón–Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 45 (1st Cir. 1992).  In order to assert a valid substantive due process claim, [the plaintiff has] to prove that [he] suffered the deprivation of an established life, liberty, or property interest, *and* that such deprivation occurred through governmental action that shocks the conscience. *Pagán v.*

[20]

*Calderón,* 448 F.3d 16, 32 (1st Cir. 2006); *Rivera v. Rhode Island,* 402 F.3d
27, 33-34 (1st Cir. 2005).

Clark v. Boscher, 514 F.3d 107, 112-13 (1st Cir. 2008) (affirming dismissal of complaint under

Fed. R. Civ. P. 12(b)(6)).  Although "the 'shock the conscience' standard is imprecise," it is

"readily apparent that negligent conduct, simpliciter, is categorically insufficient to shock the

conscience."  DePoutot v. Raffaelly, 424 F.3d 112, 118-19 (1st Cir. 2005) (citation omitted).

Rather, behavior "that sinks to the depths of shocking the contemporary conscience is much

more likely to find its roots in 'conduct intended to injure in some way unjustifiable by any

government interest.'"  Id. at 119 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 849, 118

S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).  While the inquiry is fact-specific, the case law has

established "that in order to shock the conscience, conduct must at the very least be 'extreme

and egregious,' or, put another way, 'truly outrageous, uncivilized, and intolerable.'"  Pagan v.

Calderon, 448 F.3d 16, 32 (1st Cir. 2006) (internal citations omitted).  Also, "'mere violations of

state law, even violations resulting from bad faith,' do not invariably amount to conscience-

shocking behavior."  Id. (quoting DePoutot, 424 F.3d at 119) (internal punctuation omitted).

"Rather, conscience-shocking behavior 'must be stunning.'"  Id. (quoting Amsden v. Moran, 904

F.2d 748, 754 n.5 (1st Cir. 1990)).

In the instant case, Thomas has not claimed more than an allegedly unfair investigation

and termination, which was eventually reversed through the prescribed appellate process.  He

has cited no cases, and none have been found, where such conduct, even if motivated by bad

faith, supports a substantive due process violation.  Thomas argues only that an evaluation of

his claim is better decided after further development of the record.  (See Pl. Opp. at 15).

[21]

Nevertheless, as the case on which he relies, Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617 (1st

Cir. 2000), recognizes, it may be appropriate to assess the sufficiency of the claim at the motion

to dismiss stage as well.  Id. at 622-23 (although the court found "the question to be a close

one," it affirmed the dismissal of a substantive due process claim under Fed. R. Civ. P. 12(b)(6)).

Here, the conduct alleged by Thomas is far less egregious than in cases where the controlling

authority has found violations of substantive due process.  For example, "conscience-shocking

state action has been found where a suspect's stomach was forcibly pumped to obtain

evidence*, see Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952), and where a

suspended police officer was required to undergo a penile plethysmograph as a condition of

reinstatement*, see Harrington v. Almy*, 977 F.2d 37, 43-44 (1st Cir. 1992)."  Cruz-Erazo, 212 F.3d

at 623.  It also has been found under circumstances involving the intentional framing of inno-

cent individuals for crimes they did not commit.  See Limone v. Condon, 372 F.3d 39, 44-45 (1st

Cir. 2004).  On the other hand, no due process violation has been found under circumstances

where defendant police officers engaged in ongoing harassment and intimidation against the

plaintiffs, occupied the plaintiffs' home without permission, and perjured themselves in an

effort to support false charges against one of the plaintiffs.  See Cruz-Erazo, 212 F.3d at 618-23.

Nor has a due process violation been found under circumstances where the defendants' failure

to perform background checks on two individuals caring for children in a foster home, despite

regulatory requirements to do so, led to the abuse of the children by the two individuals.  See

J.R. v. Gloria, 593 F.3d 73, 79-80 (1st Cir. 2010).

[22]

Thomas' allegations, which involve no physically intrusive or violent behavior on the part of the defendants, and no threats to deprive the plaintiff of his freedom, paint a much less extreme picture than even <u>Cruz-Erazo</u> and <u>J.R.</u> where no substantive due process violation was found.  Finally, dismissal of the substantive due process claim is even more appropriate here, since Thomas will be proceeding with his First Amendment claim.  Thomas' substantive due process claim "is coextensive with his First Amendment claim[,]" so if his First Amendment claim turns out to be viable, "there is obviously no need to enter the uncharted thicket of substantive due process to find an avenue for relief[.]"  <u>Nestor Colon Medina & Sucesores, Inc. v. Custodio</u>, 964 F.2d 32, 46 (1st Cir. 1992).  For all these reasons, Count III will be dismissed.

> **E.**     **Count IV – Violation of Fourteenth Amendment – Defamation**

In Count IV of the complaint, Thomas alleges that he was defamed, and suffered damage, "through numerous false statements concerning Thomas made to St. Pierre during his investigation" as well as by statements made by St. Pierre during and after the investigation. (Compl. ¶¶ 235-36).  He alleges further:

> As a result of the conduct of the defendants, Thomas' Fourteenth Amendment rights have been violated and his reputation has been severely damaged and a stigma has now been imposed that will interfere with his ability to take advantage of future employment opportunities. Thomas has suffered a loss of liberty interest in his reputation and a property interest in his loss of employment as a direct result of the false allegations advanced against him by the defendants.  Thomas has further suffered a loss of wages, benefits, reputation and earning capacity as well as suffering emotional and physical pain and distress, and has incurred legal and medical costs.  All such damages continue to this date.

[23]

(Id. ¶ 237).  For the reasons detailed herein, this claim fails to state a violation of Thomas'

constitutional rights as he cannot establish that he suffered any deprivation "without due

process of law."  Therefore, Count IV will be dismissed.

The case law acknowledges "that the Fourteenth Amendment offers protection against

a severely defamatory charge, such as a claim of 'dishonesty or immorality' that might

'seriously damage' one's 'standing and associations in his community' or impose a 'stigma' that

significantly interfered with his ability to 'take advantage of other employment opportunities.'"

Beitzell v. Jeffrey, 643 F.2d 870, 877 (1st Cir. 1981).  Under such circumstances, one's reputa-

tion can be considered a "liberty" interest protected by the Fourteenth Amendment.  Id.

However, "no constitutionally protected 'liberty' interest in reputation is infringed unless the

reputational harm is 'unusually serious . . . as evidenced by the fact that employment (or some

other right or status) is affected.'"  Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 32 (1st

Cir. 1996) (quoting Beitzell, 643 F.2d at 878).  See also Rodriguez de Quinonez v. Perez, 596 F.2d

486, 489 (1st Cir. 1979) ("While defamation by a governmental official, standing alone, does not

work a deprivation of liberty protected by the fourteenth amendment, *Paul v. Davis*, 424 U.S.

693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976), governmental action altering a right or status pre-

viously held under state law 'combined with the injury resulting from the defamation, justifie(s)

the invocation of procedural safeguards.'  *Id.* at 708-09, 96 S. Ct. at 1164.").  It is Thomas'

contention that the harm to his reputation has and will continue to affect his employment

options, and that the defendants, therefore, "deprived him of a 'liberty' interest in his good

name and reputation."  Romero-Barcelo, 75 F.3d at 32.

[24]

This court does not need to reach the issue whether Thomas has pleaded sufficient facts to establish a constitutionally protected liberty interest, since he cannot allege that he was deprived of any such interest "without due process of law."  "The cases make clear that, when a constitutionally protected interest in reputation is at stake, the Fourteenth Amendment requires a proceeding at which plaintiff has an opportunity to clear his name." Beitzell, 643 F.2d at 879, and cases cited.  "For where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 573, 92 S. Ct. 2701, 2707, 33 L. Ed. 2d 548 (1972) (punctuation and quotation omitted).  Here, however, Thomas had a hearing and an opportunity to clear his name, both at the pre-termination and post-termination stages.  He was represented by counsel, could cross-exam witnesses and put on evidence on his own behalf.  Under such circumstances, Thomas "received the process that was his due." Beitzell, 643 F.2d at 879.  Count IV fails to state a claim and will be dismissed.

**F.**     **Count V – Civil Conspiracy**

In Count V, Thomas alleges that "Harrington and St. Pierre acted in concert to inflict a wrong on Thomas by, among other things, initiating and orchestrating a flawed and biased investigation of Thomas."  (Compl. ¶ 239).  At this stage, Thomas has stated a claim for conspiracy and the motion to dismiss Count V is denied.

The parties agree that the standard for civil conspiracy is set forth in Kurker v. Hill, 44 Mass. App. Ct. 184, 689 N.E.2d 833 (1998).  Thus, as Kurker recognized, the Restatement (Second) of Torts § 876(b) (1977) provides that a person may be liable in tort if he "knows that

the conduct of another person constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Kurker, 44 Mass. App. at 189, 689 N.E.2d at 837 (internal punctuation omitted).  "Key to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan."  Id.

Harrington has moved to dismiss this count on the grounds that Thomas has not alleged facts which would establish a common tortious plan involving Harrington and St. Pierre.  (Town Mem. at 15-16).  This court does not agree.  There are sufficient allegations to the effect that Harrington had gone to great lengths over the years to hire St. Pierre (Compl. ¶ 106-07), and that Harrington hired St. Pierre to investigate L'Esperance, and then Thomas, without proper approval, and so that Harrington would be protected in the investigation.  (Id. ¶¶ 101-09).  Thomas has also alleged that St. Pierre coached witnesses to provide specific information against Thomas (id. ¶ 153), that St. Pierre kept Harrington apprised of the investigation (id. ¶ 158), and that Harrington was "intent on terminating Thomas[.]"  (Id. ¶ 157).  The clear inference, if not express allegation, is that St. Pierre worked to further Harrington's goal.  These allegations are sufficient at this stage to state a claim for conspiracy between Harrington and St. Pierre.

### G.    Count VII – Violation of Mass. Gen. Laws ch. 12, § 11I – The Massachusetts Civil Rights Act

In Count VII, Thomas alleges that Harrington and other Individual Defendants, but not the Town, are liable under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I.  For the reasons detailed herein, this count concludes that with respect to Harrington,

further development of the record is needed before the sufficiency of this count can be assessed.

"To establish a claim under the MCRA, a plaintiff must prove 1) his exercise or enjoyment of his rights secured by the Constitution or the laws of either the United States or the Commonwealth have been subjected to interference or attempted interference by the defendants and 2) that the interference or attempted interference was by 'threats, intimidation or coercion.'" Carroll v. City of Quincy, 441 F. Supp. 2d 215, 226 (D. Mass. 2006) (quoting Bally v. Northeastern Univ., 403 Mass. 713, 717, 532 N.E.2d 49, 51–52 (1989)).  These requirements "are 'coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not.'"  Id. (quoting Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23, 473 N.E.2d 1128, 1131 (1985)).  In addition, the MCRA action requires proof that the defendants used "threats, intimidation or coercion."  At issue is whether this latter element is missing in the instant case.

The Massachusetts Supreme Judicial Court has defined the words "threats, intimidation or coercion" as follows:

> "Threat" ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. ["Coercion" is] "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

Ali v. Univ. of Mass. Med. Ctr., 140 F. Supp. 2d 107, 110 (D. Mass. 2001) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, 631 N.E.2d 985, 990 (1994)) (alteration in original); see also Mancuso v. Mass. Interscholastic Athletic Ass'n, Inc., 453 Mass.

[27]

116, 131, 900 N.E.2d 518, 531 (2009). Therefore, violations of the MCRA typically involve "actual or potential physical confrontation accompanied by a threat of harm[.]"  Planned Parenthood League of Mass., Inc., 417 Mass. at 473, 631 N.E.2d at 989.  Nevertheless, economic coercion, standing alone, may be actionable under the MCRA.  Buster v. George W. Moore, Inc., 438 Mass. 635, 647-48, 783 N.E.2d 399, 411 (2003).

In the instant case, Thomas alleges "that the flawed investigation and the actions of Harrington (and others), including the false statements concerning Thomas, the publication of the Thomas Report, the scheduling of the termination hearing, the termination hearing itself and the events leading up to his actual termination so 'threatened' Thomas that Thomas contemplated leaving his job." (Pl. Opp. at 18).  "Simply put, Harrington's 'intentional exertion of pressure' made Thomas so 'fearful or apprehensive of injury or harm' that he contemplated quitting his position.'" (Id. at 19).  While it appears unlikely that such conduct will rise to the level of threats, intimidation or coercion, further development of the record is appropriate.  See Rinsky v. Trs. of Boston Univ., Civil Action No 10cv10779-NG, 2010 WL 5437289, at *8-9 (D. Mass. Dec. 27, 2010) (finding allegations that plaintiff was pressured into staying in position, despite continued sexual harassment, because of inferences that otherwise her evaluations would suffer, "barely suffice" to state a claim under MCRA, but court denies motion to dismiss). Therefore, Harrington's motion to dismiss this Count is denied.

### H.    Count VIII – Intentional Infliction of Emotional Distress

In Count VIII of the complaint, Thomas alleges a claim against Harrington and other individuals for intentional infliction of emotional distress.  Again, while the allegations of the

[28]

complaint are "barely sufficient" to state a claim, further development of the record is appropriate given the allegations of a prolonged and multi-faceted plan on the part of Harrington to force Thomas out of his job.

In order to establish a claim for intentional infliction of emotional distress, Thomas must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community'; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was 'severe.'" Howell v. Enter. Publ'g Co., LLC, 455 Mass. 641, 672, 920 N.E.2d 1, 28 (2010) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315, 318-19 (1976)) (additional citations and internal punctuation omitted).  "To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and utterly intolerable in a civilized community.  Liability cannot be founded upon mere insults, threats, or annoyances." Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 596, 747 N.E.2d 729, 747 (2001) (quoting Cady v. Marcella, 49 Mass. App. Ct. 334, 340-41, 729 N.E.2d 1125, 1131 (2000)) (additional citations and internal punctuation omitted).  Similarly, as the SJC has explained:

> liability cannot be predicated upon "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," nor even is it enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go

[29]

> beyond all possible bounds of decency, and to be regarded as atrocious,
> and utterly intolerable in a civilized community."

Foley v. Polaroid Corp., 400 Mass. 82, 99, 508 N.E.2d 72, 82 (1987) (quoting Restatement

(Second) of Torts § 46, comment d (1965)).

Obviously, the standard for this claim is a very high one.[2]  Harrington argues that his

challenged conduct, described as "retaining St. Pierre to conduct an investigation of Thomas

and allegedly raising concerns about Thomas's residency, without more, does not constitute

conduct that is 'utterly intolerable' by any objective measure and, hence, Count Eight should be

dismissed."  (Town Mem. at 18-19).  A fair reading of the complaint, however, depicts an

ongoing effort on the part of Harrington to have Thomas removed from the police force.  The

plaintiff should be entitled to more fully develop the record to determine if there are facts

which support this claim.  See Armano v. Fed. Reserve Bank of Boston, 468 F. Supp. 674, 676 (D.

Mass. 1979) (allegations "that Bank undertook a planned and systematic program to harass [the

plaintiff] in an attempt to force him to voluntarily terminate his employment" are sufficient to

withstand motion for judgment on the pleadings; "there is a factual question as whether the

---

[2]  This court recognizes that extreme conduct is necessary to sustain both a claim for intentional infliction of emotional distress and for a substantive due process claim, as described above.  However, the case law establishes that the door is only "slightly ajar" for the federal constitutional claim, see Clark, 514 F.3d at 112, and courts are reluctant to expand the parameters of the constitutional claim. See Nestor Colon Medina & Sucesores, Inc., 964 F.2d at 46.  The tort claim is more commonplace, and this court finds that it is appropriate to allow the plaintiff to more fully expand the facts relative to the tort claim.  See Correia v. Town of Framingham, 969 F. Supp. 2d 89, 97, 99-100 (D. Mass. 2013) (claim of Fourteenth Amendment substantive due process violation dismissed on summary judgment, while claim of intentional infliction of emotional distress proceeds to trial).

[30]

above-described conduct could reasonably be found to be so extreme and outrageous as to permit recovery").  Therefore, Harrington's motion to dismiss Count VIII is denied.

I.     **Count IX – Intentional Interference with Contractual Relations**
       **Count X –Interference with Advantageous Business Relations**[3]

In Counts IX and X, Thomas alleges that Harrington and others interfered with his contractual and advantageous business relations with the Town by causing the Town to terminate his employment as a police officer, in violation of the CBA.  Again, the sufficiency of these claims against Harrington will have to await further development of the record.

"To establish a claim of intentional interference with contractual relationship, [Thomas] must show (1) that he had a contract with a third party, (2) that the defendants knowingly induced the third party to break that contract, (3) that the defendants' interference was improper in means or motive, and (4) that [Thomas] was harmed by the interference." Cachopa v. Town of Stoughton, 72 Mass. App. Ct. 657, 660, 893 N.E.2d 407, 411 (2008), and cases cited.  Similarly, "[t]o make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  Blackstone v. Cashman, 448 Mass. 255, 260,

---

[3]  The Town Defendants have adopted the arguments of the Individual Defendants in connection with Counts IX, X and XI.  However, this court is only addressing herein the claim against Harrington.

860 N.E.2d 7, 12-13 (2007).  When officials, such as Harrington, are acting "within the scope of their employment responsibilities," they can only be held liable under these theories if "their actions are motivated by actual, and not merely implied, malice[.]"  Id. at 261-62, 860 N.E.2d at 13-14.  "[A]ctual malice" in these circumstances is defined as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest."  Id. at 261, 860 N.E.2d at 13 (quotation and citation omitted).

In the instant case, the defendants argue that Harrington cannot be deemed to have acted with actual malice.  In particular, they reason that because Thomas was named in the L'Esperance Report, "it can hardly be said then that Harrington's decision to retain St. Pierre to look into these allegations (concerning Thomas) were 'unrelated' to a legitimate corporate purpose."  (Indiv. Defs. Mem. (Docket No. 24) at 12).  However, reading the complaint in the light most favorable to the plaintiff, Thomas has alleged that Harrington acted in retaliation for Thomas' reports of misconduct on the part of Sullivan (Compl. ¶ 121), and that Harrington was "intent on terminating Thomas" so that the statutory hearing he provided was basically a sham. (Id. ¶ 157).  These allegations are sufficient at this stage to show that Harrington acted with "a spiteful, malignant purpose" that was unrelated to any valid interest of the Town or its police department.  Accordingly, the motion to dismiss Counts IX and X is denied.

### J.     Count XI -- Defamation

In Count XI, Thomas alleges that Harrington and other defendants "made and published false statements about Thomas, thereby exposing him to ridicule and contempt in the community, in violation of the common law of Massachusetts."  (Compl. ¶ 277).  According to Thomas,

[32]

"[t]hese statements include numerous false accusations and misrepresentations to third parties, alleging that Thomas is a liar, malingerer and common thief." (Id. ¶ 278).  Thomas fails to attribute any specific comments to Harrington, but instead alleges that "Harrington relied on these false statements to terminate Thomas" and that, "[a]t all times, Harrington knew of the falsity of the statements." (Id. at ¶ 279).  Absent the identification of any specific comments that allegedly came from Harrington, the defamation claim against him must be dismissed.

"To prevail on a claim of defamation, a plaintiff must establish that the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66, 809 N.E.2d 1034, 1036 (2004) (footnote omitted).  The "threshold issue" as to whether a statement is reasonably susceptible of a defamatory meaning is a question of law for the court. Foley v. Lowell Sun Publ'g Co., 404 Mass. 9, 11, 533 N.E.2d 196, 197 (1989).  Although a plaintiff does not have to comply with the heightened pleading requirement of Fed. R. Civ. P. 9(b) governing allegations of fraud, "the pleadings in a defamation case need to be sufficiently detailed to the extent necessary to enable the defendant to respond." Bishop v. Costa, 495 F. Supp. 2d 139, 141 (D. Me. 2007), and cases cited.  In the instant case, the complaint does not attribute any defamatory comments to Harrington, nor does Thomas identify any such comments in his opposition to the motion to dismiss.  (See Docket No. 30).  He merely claims that Harrington relied on allegedly defamatory comments to justify his termination of the

[33]

plaintiff's employment.  (Id. at 12 n.5).  This is not adequate to state a claim for defamation under Massachusetts law.  Therefore, Harrington's motion to dismiss Count XI is allowed.

## IV.   CONCLUSION

For the reasons detailed herein, the Town Defendants' motion to dismiss is ALLOWED as to Counts II, III, IV and XI, and DENIED as to Counts I, V, VII, VIII, IX and X.  Count XII has been withdrawn by the plaintiff.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[34]