UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARK THOMAS,           )
                                  )

           Plaintiff,      )

      v.                    )          CIVIL ACTION
                                    )          NO. 14-13726-JGD
TOWN OF SALISBURY, CORNELIUS J.     )
HARRINGTON a/k/a "NEIL" HARRINGTON,   )
and ROBERT ST. PIERRE,      )
                                  )

           Defendants.     )

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

September 30, 2017

DEIN, U.S.M.J.

### I.  INTRODUCTION

The plaintiff, Mark Thomas, was a police officer with the Town of Salisbury, Massachu-setts. He brought this action alleging numerous violations of his constitutional and state law rights in connection with an internal investigation brought against him, his resulting termination as a police officer, and his subsequent reinstatement. The defendants originally fell into three groups, including the Town of Salisbury and the Town Manager, Cornelius (Neil) Harrington (collectively the "Town Defendants"), and the "Individual Defendants," which group included police officers Richard Merrill, Jr., Eugene Scione, Steven Sforza and Michael Alder; Robert St. Pierre (the former Chief of the Salem Police Department who conducted the investi-gation); and Thomas Fowler (the current Chief of the Salisbury Police Department). The final group, collectively referred to as the "L'Esperance Defendants," included David J. L'Esperance

(the former Salisbury Chief of Police); Kevin Sullivan (the former Salisbury Acting Chief of Police); and Daniel McNeil (a retired Sergeant from the Salisbury Police Department).

All three groups moved to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). This court issued extensive decisions on those motions, dismissing all the claims except Count I (violation of First Amendment Rights – Retaliation against the Town and Harrington), Count V (civil conspiracy against Harrington and St. Pierre), Count VII (violation of Mass. Gen. Laws. ch. 12, § 11I - The Massachusetts Civil Rights Act against Harrington), Count VIII (intentional infliction of emotional distress against Harrington), Count IX (intentional interference with contractual relations against Harrington), and Count X (interference with advantageous business relations against Harrington). (See Docket Nos. 48-50).

Following the completion of discovery, the defendants moved for summary judgment on all of the remaining counts. For the reasons detailed herein, the Defendants' Motion for Summary Judgment (Docket No. 70) is ALLOWED as to Count I, the alleged violation of Thomas's First Amendment Rights. Since this is the only federal law claim, a status conference will be held to discuss whether the remaining state law claims should be remanded to the state court in light of Wilber v. Curtis, --- F.3d ---, No. 16-2250, 2017 WL 4159603, *6 (D. Mass. Sept. 20, 2017) ("the Supreme Court has instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 619 n.7, 98 L. Ed. 2d 720 (1988))).

## II.  FACTS RELATING TO COUNT I: FIRST AMENDMENT RETALIATION CLAIM

On February 24, 2011, Thomas delivered a two-page memorandum to the Chairman of the Board of Selectman, Donald Beaulieu, which contained a number of allegations of sexual harassment concerning then Acting Chief of Police Sullivan (the "whistle-blower letter").  (DF ¶¶ 48, 43).  In Count I of his Complaint, Thomas alleges that, in response, and in violation of his First Amendment rights, the Town Manager Neil Harrington and Robert St. Pierre, whom Harrington had hired to investigate affairs at the Police Department, retaliated against Thomas by targeting him for removal from the police force, and permitting a "flawed and rigged investigation" of complaints against Thomas to be conducted.  (Pl. Mem. (Docket No. 80) at 3 ("Thomas here does not propose that the Board's suggestion that an investigation may be appropriate was, in and of itself, retaliatory, rather this **particular** flawed and rigged investigation, with pre-determined results, was conducted in retaliation for Thomas' disclosure of Sullivan's improprieties approximately a week prior to the commencement of the formal Thomas Investigation." (emphasis in original)).  The defendants have moved to dismiss this claim on various grounds, including that his speech was not protected since Thomas was acting in his capacity as a police officer, and not a private citizen, when he communicated with the Board of Selectman.  At the motion to dismiss stage, this court concluded that the allegations of the Complaint were sufficient to support a finding that Thomas was acting as a private citizen, so Count I was not dismissed.  (See Memorandum of Decision and Order on Town Defendants' Motion to Dismiss (Docket No. 48) ("Town Dec.") at 10-15).  After consideration of the full record, this court agrees with the defendants that Thomas' speech was not protected under the

First Amendment.  Moreover, this court finds that the defendant Harrington is entitled to qualified immunity on this claim.  Therefore, summary judgment shall be entered in favor of the defendants on Count I of the Complaint.

## Background

This decision will assume familiarity with this court's prior decisions on the motions to dismiss.  (See Docket Nos. 48-50).  Only the facts relevant to the motion for summary judgment will be repeated herein.[1]  However, a general chronology will be helpful to put the current issues into context.

Thomas has been a police officer with the Town of Salisbury since the 1980s.  (Compl. (Docket No. 1) at 16, 19).  In early 2006, the Town Manager, Neil Harrington, put together a four-person Screening Committee to screen the applicants for a new Chief of Police for the Town.  (DF ¶ 6).  Harrington was a member of the Committee, as was Thomas.  (Id.).  The Screening Committee unanimously recommended David L'Esperance.  (DF ¶ 7).  Harrington hired L'Esperance as the Chief of Police in April 2006.  (DF ¶ 10).  In accordance with the Town Charter, L'Esperance's contract was verified by the Board of Selectmen.  (Id.).  On, or soon after, his first day on the job, L'Esperance appointed Thomas to the position of Detective.  (DF ¶ 12).

---

[1] Unless otherwise indicated, the facts are derived from the Defendants' Local Rule 56.1 Concise Statement of Material Facts ("DF") (Docket No. 73); Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts ("PR") (Docket No. 81); Plaintiff's Counterstatement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("PF") (Docket No. 81 beginning at ¶ 100); and Defendants' Responses to Plaintiff's Counterstatement ("DR") (Docket No. 87).  All of these facts have been combined in a filing by the defendants entitled "Consolidated Statement of Material Facts" (Docket No. 87).  The defendants' exhibits ("Defs. Ex. ___") are found at Docket Nos. 74 and 75 and the plaintiff's exhibits ("Pl. Ex. ___") are found at Docket No. 81.

It is Thomas' contention that this appointment, as well as his rising status in the Department, caused much jealousy among his fellow officers.  (PR ¶ 12).

### The L'Esperance Investigation

In the Fall of 2010, two Salisbury Police Officers, Tony King and Steven Sforza, learned of certain alleged misconduct involving Chief L'Esperance, which they brought to the attention of the Executive Officer, Kevin Sullivan.  (DF ¶ 20).  Sullivan, in turn, brought this information to the attention of Harrington.  (Id.).  Harrington placed L'Esperance on Administrate Leave on December 5, 2010, and appointed Sullivan as the Acting Police Chief.  (DF ¶ 21).  On or about December 9, 2010, Harrington, on behalf of the Town, entered into a contract with Robert St. Pierre, effective December 1, 2010, to conduct an investigation into the charges against L'Esperance.  (DF ¶ 23; PR ¶ 23).  Harrington had worked with St. Pierre in Salem, Massachusetts, where Harrington had been the Mayor and St. Pierre had been the Chief of Police.  (DF ¶¶ 7, 15).

On December 27, 2010, the Board unanimously renewed Harrington's employment as Town Manager.  (DF ¶ 31).  On January 11, 2011, Harrington sent L'Esperance a letter, copy to the Board of Selectman, advising him that St. Pierre had been hired to conduct an administrative review of the allegations of misconduct that had been made against him, and advising L'Esperance that he would be interviewed by St. Pierre on January 13, 2011.  (DF ¶ 32).  During the course of the L'Esperance investigation, St. Pierre interviewed 14 officers and civilian employees of the Police Department.  (DF ¶ 36).  On January 18, 2011, L'Esperance tendered his resignation from the Salisbury Police Department.  (DF ¶ 37).  On January 24, 2011, St. Pierre

turned in his investigative report concerning L'Esperance to Harrington (and the Board). (See DF ¶ 38). Therein, St. Pierre concluded that he would have recommended the immediate dismissal of L'Esperance if he had not already resigned. (Id.).

### Allegations Against Thomas

The L'Esperance Report also contained allegations against Thomas. (PR ¶ 38). In particular, these allegations included that Thomas had studied for the bar exam while on the job, that Thomas had witnessed L'Esperance pilfering evidence at crime scenes and that Thomas had conspired with L'Esperance to create a false resume for submission to the FBI that included Thomas' designation to the position of Chief of Detectives. (PF ¶ 114).[2] On January 24, 2011, St. Pierre gave a summary of his report to the Board of Selectmen meeting in an Executive Session. (DF ¶ 39). On either that day and/or on February 14, 2011, the Board asked Harrington to ask St. Pierre to conduct an investigation into certain "loose ends" with respect to L'Esperance, and to conduct an investigation into the allegations made against Thomas during the L'Esperance investigation. (DF ¶ 58; PR ¶ 58; DF ¶ 59). Thomas was aware of the decision to investigate him by no later than February 14, 2011, and he knew that the investigation was going to be conducted by St. Pierre, over Thomas's objection that the investigation should be done internally by a superior officer. (See DF ¶ 60).

---

[2] At the completion of the L'Esperance investigation, there were no witnesses stating that Thomas had been seen studying on the job, and Thomas had told St. Pierre that L'Esperance had, in fact, designated Thomas as Chief of Detectives. (PF ¶ 114). Thomas contends that other officers had also seen L'Esperance pilfering items from crime scenes. (Id.).

Harrington also met with some members of the Salisbury Police Department on January 28, 2011, and told them that he would meet with officers individually to discuss any concerns they had with the Department. (DF ¶ 40). It is unclear whether Thomas was there, but at least one Sergeant took Harrington up on his offer for a private meeting. (PR ¶ 40; DF ¶ 41). During that meeting, the Sergeant complained that Harrington had not taken action about L'Esperance sooner. (Id.).

Meanwhile, Sullivan was serving as the Acting Chief of Police. Thomas and Sullivan had a negative history and it did not improve. For example, Sullivan issued a reprimand against Thomas, which was later rescinded. (See DF ¶¶ 44-47; PR ¶ 44). Harrington was advised by Sullivan about the reprimand as it was happening. (See PR ¶ 45).

### Thomas's Letter to the Board of Selectmen

On February 24, 2011, Thomas provided his so-called "whistle blower" letter to the Chairman of the Board of Selectman, reporting sexual harassment claims against Sullivan. (DF ¶ 48). As detailed above, by the time Thomas provided the letter to the Board, he was aware that the Board had decided that his conduct would be investigated by St. Pierre. Thomas' letter began as follows:

> I was recently given information from Officer Dan McNeil regarding an alarming allegation against another member of the Salisbury Police Department. In light of what just transpired in our town, I feel that it is my duty to fully disclose as a certified sexual assault investigator trained by the Massachusetts State Police through the Essex County District Attorney's Office, and it being the wish of the Selectmen, Town Manager, and residents of Salisbury to come forward with identified victims, named witnesses, and factual evidence in regard to any and all Salisbury Police officers with allegations of sexual harassment and/or misconduct, and actions unbecoming an officer.

[7]

(Def. Ex. H at 1).  The letter concluded as follows:

> I feel that it is in the best interest of the town and for the men and women of the Salisbury Police to fully disclose these serious charges.  The Board of Selectmen and the Town Manager impressed upon all of us that they would like the police to come forward with named witnesses and victims of alleged misconduct rather than going forward with just rumor or innuendo.

(Id. at 3).  All of the allegations were based on information Thomas allegedly obtained from other police officers.

The Salisbury Police Department's Rules and Regulations provided:

**RULE 13.5 – REPORT RULE VIOLATIONS**

> Officers **shall,** upon observing or otherwise becoming aware of a violation by another officer or employee of the department's Rules and Regulations or Policies and Procedures, as set forth in this Manual or by other departmental directives or as governed by law, report said violation to their superior officer who will be responsible for appropriate action, report submission and follow-up.

(Def. Ex. II, § 13.5 (emphasis in original)).  The Salisbury Police Department had a Sexual Harassment Policy which prohibited harassment and required all employees to "actively participate in the Department's effort to prevent and eliminate harassment, sexual harassment, and discrimination[.]"  (Def. Ex. JJ at 5.03.6).  The Policy also provided that all employees "[m]ay be personally liable if they engage in harassing behavior, or have knowledge of harassment and fail to act appropriately."  (Id. at § 5.03.12).  Thomas denies that he was acting pursuant to the Department Rules or Policies when he reported on Sullivan, although he admits being familiar with them.  (See generally Pl. Mem. (Docket No. 80) at 16).

The Chairman of the Board gave a copy of Thomas's letter to Harrington.  (DF ¶ 48).  Unbeknownst to Thomas, in or about mid-February 2011, Officer McNeil had approached

Harrington and also told him about allegations of sexual harassment concerning Sullivan.  (PR ¶ 48).  Harrington had acknowledged the complaint, but said that he would "sit on it" for now, and did not report it to any Selectman.  (Id.).

Thomas's charges, however, resulted in further investigation.  Thus, a few days later, on February 28, 2011, Harrington told Thomas that, in accordance with the Town's sexual harassment policy, and after consulting with counsel, a confidential investigation into the charges of sexual harassment by Sullivan was going to take place beginning that week.  (DF ¶ 49). Harrington reported the same to the Board of Selectmen on February 28, 2011 as well.  (DF ¶ 50).  In fact, on the same day Harrington, on behalf of the Town, hired Lt. Mary Butler from the Salem Police Department to conduct the investigation.  (DF ¶ 51).

Sullivan retired from the Salisbury Police Department on March 1, 2011, effective immediately.  (DF ¶ 52).  Richard Merrill was appointed Acting Police Chief by Harrington.  (Id.). Lt. Butler submitted her investigative report about Sullivan to Harrington on May 23, 2011.  (DF ¶ 53).  Harrington advised the Board of Selectmen that the investigation had been completed on June 9, 2011, and Thomas was similarly informed by Acting Chief Merrill on June 22, 2011. (DF ¶¶ 54, 55).

## The Investigation of Thomas

Meanwhile, on the same day that he hired Lt. Butler to investigate Sullivan, February 28, 2011, Harrington, on behalf of the Town, entered into a contract with St. Pierre to conduct an investigation and render a report concerning the allegations of misconduct involving Thomas which had surfaced during the L'Esperance investigation.  (See DF ¶ 63).  The investigation

continued for months, during which Acting Chief Merrill placed Thomas on paid Administrative Leave, beginning on May 24, 2011. (DF ¶ 64). Thomas contends that the investigation was improper and biased. The facts relating to whether the investigation of Thomas was conducted in an appropriate manner are in dispute.

St. Pierre provided Harrington with his findings and recommendations concerning his investigation of Thomas on September 28, 2011. (DF ¶ 77). St. Pierre concluded that Thomas had engaged in misconduct that warranted his discharge from the Salisbury Police Department. (DF ¶ 78). Harrington, after consultation with counsel, provided a copy of the report to the Board of Selectmen the same day. (DF ¶ 80). Harrington also provided a copy of the report to the Newburyport Daily News, and a copy went to the Board of Bar Overseers as well. (PR ¶ 80; PF ¶ 129).

On September 28, 2011, Harrington advised Thomas that he intended to hold a disciplinary hearing against Thomas in accordance with the Civil Service laws. (DF ¶ 81). Although originally scheduled for October 11, 2011, it was continued and eventually held on December 15, 2011. (DF ¶¶ 81, 82). The Police Department did not put on any witnesses, relying instead on St. Pierre's Report, and Thomas declined to testify. (DF ¶ 82; PR ¶ 82). On February 8, 2012 Harrington issued his decision in which he upheld two of the charges and dismissed two others, including that Thomas had witnessed L'Esperance pilfer evidence at crime scenes. (DF ¶ 83). Thomas's employment with the Town was terminated. (DF ¶ 83).

The Union represented Thomas in an Arbitration proceeding addressing the issue whether there was just cause to terminate Thomas's employment. (DF ¶ 85). On October 31,

2012, the Arbitrator issued a decision finding that the Town had not had just cause for the termination. (DF ¶ 86). Thomas returned to the Salisbury Police Department on December 12, 2012. (DF ¶ 87). Thomas was paid the amounts due to him. (DF ¶ 88). Eventually, Thomas felt he was unable to work as he was in fear for his life, and was put on long term sick leave. (DF ¶¶ 92-93). He was eventually retired on a disability. (DF ¶¶ 94-98). He also received accidental disability benefits. (PF ¶ 99).

Additional facts will be provided below where appropriate.

### III. ANALYSIS

#### A. Standard of Review – Summary Judgment

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted). The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

[11]

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court affords "no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotation marks and citation omitted).  Rather, "[w]here, as here, the nonmovant bears the burden of proof on the dispositive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment."  Id. (citation omitted).

Applying these principles to the instant case compels the conclusion that the defendants' motion for summary judgment must be allowed.

### B.    Count I – Violation of First Amendment Rights – Retaliation

In Count I of his Complaint, Thomas is seeking to hold Harrington and the Town liable, pursuant to 42 U.S.C. § 1983, for violations of his First Amendment right to engage in free speech.  Specifically, Thomas alleges that "Salisbury, by and through Harrington (an authorized

decision maker for the municipality), violated Thomas' First Amendment rights when he retaliated against him for exposing and disclosing to Harrington (via oral and written communications) the criminal activities of Sullivan, which included allegations of sexual assault." (Compl. ¶ 215). He further alleges that the retaliatory conduct included subjecting Thomas to a flawed and unauthorized investigation (id. ¶ 216), and ordering Thomas to cease the practice of law while at the same time allowing other police officers to continue with other law enforcement related jobs outside their employment as Salisbury police officers. (Id. ¶ 220). "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). There is no dispute that Harrington was acting under color of state law at all relevant times. At issue is whether his alleged conduct vis-à-vis Thomas violated the plaintiff's rights under the First Amendment. The defendants have moved for summary judgment on this claim, alleging, inter alia, that Thomas had not engaged in constitutionally protected speech. For the reasons detailed herein, this court agrees and judgment shall enter in favor of the defendants on Count I of the Complaint.

## Elements of a First Amendment Retaliation Claim

"It is well settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.'" Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quoting Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25-26 (1st Cir. 2010)) (additional citation omitted). In the public employment context,

[13]

however, this right is not unlimited.  As the Supreme Court explained in <u>Garcetti v. Ceballos</u>,

547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006), "[w]hen a citizen enters

government service, the citizen by necessity must accept certain limitations on his or her

freedom."  This is because

> [g]overnment employers, like private employers, need a significant degree of
> control over their employees' words and actions; without it, there would be
> little chance for the efficient provision of public services.  Public employees,
> moreover, often occupy trusted positions in society.  When they speak out,
> they can express views that contravene governmental policies or impair the
> proper performance of governmental functions.

<u>Garcetti</u>, 547 U.S. at 418-19, 126 S. Ct. at 1958 (internal citation omitted).  Consequently, "[a]

governmental employer may impose certain restraints on the speech of its employees,

restraints that would be unconstitutional if applied to the general public."  <u>Davignon v.

Hodgson</u>, 524 F.3d 91, 100 (1st Cir. 2008) (quoting <u>City of San Diego v. Roe</u>, 543 U.S. 77, 80, 125

S. Ct. 521, 523, 160 L. Ed. 2d 410 (2004)) (alteration omitted).

In accordance with the guidance set forth by the Supreme Court, including the Court's

discussion in <u>Garcetti</u>, the First Circuit has established the following three-part test for deter-

mining whether an adverse employment action violates a public employee's right of free

speech:

> First, a court must determine "'whether the employee spoke as a citizen on a
> matter of public concern.'"  *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)
> (quoting *Garcetti*, 547 U.S. at 418, 126 S. Ct. 1951).  Second, the court must
> "balance ... the interests of the [employee], as a citizen, in commenting upon
> matters of public concern and the interest of the State, as an employer, in
> promoting the efficiency of the public services it performs through its
> employees."  *Id.* at 44 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88
> S. Ct. 1731, 20 L. Ed. 2d 811 (1968)) (omission in original).  Third, the

> employee must "show that the protected expression was a substantial or
> motivating factor in the adverse employment decision."  *Id.* at 45.

Decotiis, 635 F.3d at 29.  In the event all three elements of the test "are resolved in favor of the

plaintiff, the employer may still escape liability if it can show that 'it would have reached the

same decision even absent the protected conduct.'"  Id. at 29-30 (quoting Rodriguez-Garcia v.

Miranda-Marin, 610 F.3d 756, 765-66 (1st Cir. 2010)).  It is for the court to decide, as a matter

of law, "whether the speech involved is entitled to any First Amendment protection – that is,

whether the speech is by an employee acting as a citizen on a matter of public concern."

Curran, 509 F.3d at 45, and cases cited.

### Nature of Thomas' Speech

In the instant case, the defendants concede that Thomas' speaking out about Sullivan's

conduct in sexually harassing female employees was on a subject of public concern.  See Azzaro

v. Cty. of Allegheny, 110 F.3d 968, 978-79 (3d Cir. 1997) (report of sexual harassment by person

in authority was on a matter of public concern).  Nevertheless, "even when the subject of an

employee's speech is a matter of public concern[,]" public employees who make statements

pursuant to their official duties "are not speaking as citizens for First Amendment purposes, and

the Constitution does not insulate their communications from employer discipline."  Ross v.

Breslin, 693 F.3d 300, 305 (2d Cir. 2012) (quoting Garcetti, 547 U.S. at 421, 126 S. Ct. at 1960).

Therefore, this court must determine whether Thomas was acting as a private citizen when he

made his complaint to the Chairman of the Board of Selectmen.

"In *Garcetti*, the Supreme Court held that public employees do not speak as citizens

when they 'make statements pursuant to their official duties,' and that accordingly, such

[15]

speech is not protected by the First Amendment." Decotiis, 635 F.3d at 30 (quoting Garcetti, 547 U.S. at 421, 126 S. Ct. at 1960).  However, the Supreme Court has since clarified that the mere fact that an individual's speech "relates to public employment" or "concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech." Lane v. Franks, 134 S. Ct. 2369, 2379, 189 L. Ed. 2d 312 (2014). Instead, as the Court explained, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id.

In order to determine whether Thomas' speech was made pursuant to his ordinary responsibilities as a police officer, this court "must take a hard look at the context of the speech." Decotiis, 635 F.3d at 32.  Although the First Circuit has emphasized that "no one contextual factor is dispositive," it has set forth a list of non-exclusive factors to guide courts in their evaluation.  Id.  Those factors include:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

Id. (internal citations omitted).  Ultimately, however, "the proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform, and not merely those formally listed in the employee's job description." Id. at 31 (quotations and citations omitted).

[16]

The further development of the record since this court's rulings on the motions to dismiss establishes that Thomas was acting in his capacity as a police officer and not as a private citizen when he made his complaints about Sullivan. As detailed above, Department regulations and policies called for police officers to monitor and report sexual harassment on the job.[3] His letter to the Board of Selectmen also made it clear that Thomas understood that the Board and the Town Manager expected "police to come forward with named witnesses and victims of alleged misconduct . . ." as well as "factual evidence in regard to any and all Salisbury Police officers with allegations of sexual harassment and/or misconduct, and actions unbe-coming an officer." (Def. Ex. H at 1, 3). Thomas in his letter refers to himself as having the "duty to fully disclose" the allegations in his capacity "as a certified sexual assault investiga-tor[.]" (Id. at 1). The allegations contained in his letter were all derived from information he had obtained on the job as a police officer. All the factors lead to the conclusion that Thomas was acting as a police officer, and not a private citizen, when he submitted his letter to the Board of Selectmen. See Amirault v. City of Malden, 241 F. Supp. 3d 288, 300-01 (D. Mass. 2017) (head of police department's detective unit was acting as a public employee, and not as a citizen, when he raised concerns about other police officers' conduct to the City Council and other city officials), and cases cited.

---

[3] Notably, in his complaint Thomas characterizes Sullivan's conduct as criminal behavior. (Compl. ¶ 215). There is no question that as a police officer Thomas was required to do something in response to criminal activity. (See Pl. Mem. (Docket No. 80) at 16 (noting that "[c]oncerns involving non-criminal employee matters in the workplace are far down the list of job functions of a police officer (although not unimportant).").

Moreover, contrary to this court's initial interpretation of the allegations of the Complaint, the factual record after discovery establishes that Thomas' complaints to the Board of Selectmen and Harrington were not made outside the appropriate chain of command. Here the record establishes that the Town Manager and the Board were the entities with authority to hire and fire the Chief of Police "and, thus, [were] an upper echelon of plaintiff['s] 'chain of command.'" Carter v. Incorporated Vill. of Ocean Beach, 693 F. Supp. 2d 203, 211 (E.D.N.Y. 2010) (part-time police officers' complaints about operation of police department made to the Village's Board of Trustees was not protected speech under the First Amendment). In addition, since Thomas' complaints related to the conduct of his direct supervisor, it was consistent with his job responsibilities that Thomas would report these concerns to Harrington and the Board. "Taking a complaint up the chain of command to find someone who will take it seriously does not, without more, transform [his] speech into protected speech made as a private citizen." Ross v. Breslin, 693 F.3d 300, 307 (2d Cir. 2012) (internal quotations and citation omitted) (public employee's report of payroll irregularities was not protected speech, even though she bypassed her immediate supervisor).

Moreover, in the instant case, Harrington and the Board were heavily involved in overseeing the investigation of, and trying to remedy, what was apparently a very troubled police department.[4] For example, shortly before Thomas submitted his letter to the Board about Sullivan, Harrington had a meeting with police officers encouraging them to meet with

---

[4] In addition to the events leading up to the resignation of two Police Chiefs, L'Esperance and Sullivan, Harrington apparently had hired another investigator to conduct an audit of the Police Department's Evidence Room. (See Defs. Mem. (Docket No. 71) at 5-6).

him to discuss Police Department affairs.  According to his letter, Thomas knew that the Board

of Selectmen was encouraging the police to come forward with facts about any wrongdoing in

the Department.  Under the facts of this case, Thomas' complaints to Harrington and the Board

were, in fact, following the appropriate chain of command and were entirely consistent with

the conclusion that he was acting in his capacity as a police officer.

In sum, Thomas made his report to Harrington and the Board in his capacity as a police

officer, his information was derived from his employment as a police officer, and he was

reporting on a subject [workplace harassment] about which he was required to report.  These

factors all "point to the conclusion that the speech was not protected[.]"  Oberg v. City of

Taunton, 972 F. Supp. 2d 174, 196 (D. Mass. 2013) (Police Chief was not acting as a private

citizen when he reported information about a patrolman to the City Council).  "A public

employee's speech focusing on the events of the employee's workplace in the context of

fulfilling official duties is the quintessential example of speech that owes its existence to a

public employee's professional responsibilities and thus is not protected under the First

Amendment."  Id. (internal quotations omitted).  Considering the totality of circumstances, this

court concludes that Thomas was not engaged in protected speech when he made his

complaints about Sullivan to Harrington and the Board.  Therefore, the defendants' motion for

summary judgment as to Count I of the Complaint is allowed.[5]

---

[5] In light of this ruling, this court will not address the defendants' claims that even if he had engaged in
protected speech, Thomas' First Amendment Retaliation claim must fail because his speech was not the
proximate cause of the loss of his job with the Police Department, and because Harrington would have
terminated Thomas' employment even without the whistle-blower letter to the Board.  (See Defs. Mem.
(Docket No. 71) at 11-12).

C.    **Harrington Is Entitled to Qualified Immunity**

"Qualified immunity, which is a question of law, is an issue that is appropriately decided by the court during the early stages of the proceedings[.]"  Tatro v. Kervin, 41 F.3d 9, 15 (1st Cir. 1994).  See also Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985) (recognizing that issue of qualified immunity may be appropriately decided at the summary judgment stage to avoid subjecting government officials to the costs and burdens of trial).  In the instant case, the defendants argue that even if they violated Thomas' First Amendment rights, Harrington is entitled to qualified immunity because the [alleged] fact that Thomas engaged in protected speech was not well-established at the relevant time.  This court agrees.

"Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"  Lane, 134 S. Ct. at 2381 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 2084-85, 179 L. Ed. 2d 1149 (2011)).  It "is a prophylactic doctrine" that "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Morse v. Cloutier, 869 F.3d 16, 22 (1st Cir. 2017) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)).  "[Q]ualified immunity gives an officer the benefit of a margin of error."  Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009).  "When properly applied," the doctrine of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'"  Morse, 869

F.3d at 23 (quoting White v. Pauly, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (per curiam) (additional citations omitted)).

In order "to determine whether qualified immunity applies in a given case, [the court] must determine: (1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010) (citing Estrada v. Rhode Island, 594 F.3d 56, 62-63 (1st Cir. 2010)). "These two prongs of the analysis need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense." Id. (citing Maldonado v. Fontanes, 568 F.3d 263, 269-70 (1st Cir. 2009)). See also Wilber v. Curtis, No. 16-2250, 2017 WL 4159603, at *4 (1st Cir. Sept. 20, 2017) ("In determining whether a government official is entitled to qualified immunity under § 1983, we must determine not only whether the official violated a federal statutory or constitutional right, but also whether the right was clearly established at the time of the challenged governmental conduct[.]" (internal quotations and citations omitted)).

As the First Circuit has explained further:

> The second step of this inquiry is itself divisible into two sub-parts. First, the plaintiff must identify either "controlling authority" or a "consensus of cases of persuasive authority" sufficient to signal to a reasonable officer that particular conduct would violate a constitutional right. *Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). The aim is to ensure that the state of the law is sufficiently specific to give fair and clear warning to government officials. *See United States v. Lanier*, 520 U.S. 259, 270-71, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997). The second sub-part asks whether a reasonable

> officer in the defendant's position would have known that his conduct
> violated the established rule.  *See Wilson v. City of Boston*, 421 F.3d 45, 57-58
> (1st Cir. 2005).

Morse, 869 F.3d at 23.  As detailed herein, this court finds that, even assuming Thomas has established that his constitutional rights were violated, he has failed to establish that "every reasonable official would have understood that" Thomas was engaged in constitutionally protected speech.  Diaz-Bigio v. Santini, 652 F.3d 45, 50-51 (1st Cir. 2011) (internal quotations and citations omitted).

As an initial matter, the evidence indicates that Harrington sought the advice of counsel before taking steps in response to Thomas' complaints about Sullivan.  "More importantly," at the time of the investigation of Thomas in 2011, "the Supreme Court had not had occasion to clarify 'the scope of a public employee's employment duties and what it means to speak pursuant to those duties' following its decision in *Garcetti*."  Meagher v. Andover Sch. Comm., 94 F. Supp. 3d 21, 43 (D. Mass. 2015) (citing Decotiis, 635 F.3d at 37).  "It was not until 2014, when the Supreme Court decided *Lane*, that the Court explained that 'the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech[,]' and that the 'critical question' for purposes of the First Amendment analysis 'is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'"  Id. (quoting Lane, 135 S. Ct. at 2379).  Moreover, both before and after Lane, the inquiry as to whether speech is protected involves a fact-specific analysis as to the context in which the speech was made.  See Decotiis, 635 F.3d at 32.  Therefore, "the contours of the

[22]

[First Amendment] right were still cloudy" and not clearly established at the time of the events in question in this case.  Id. at 37.

Thomas' case differs significantly from the concerns raised by Justice Thompson in her dissent in Eves v. LePage, 842 F.3d 133, 146 (1st Cir. 2016), on which Thomas relies.  Justice Thompson disagreed with the majority's conclusion that the Governor was entitled to qualified immunity on a claim that he had violated a legislator's First Amendment rights by threatening to withhold funding from a non-profit unless it terminated its employment contract with the legislator.  Justice Thompson argued that the majority had construed "the clearly-established-right prong" of the qualified immunity analysis too narrowly, and required that the precedent be too directly on point before an official could be held liable.  As a result, according to Justice Thompson, the court granted immunity to the Governor despite his having allegedly engaged in clearly unconstitutional conduct.  Id. at 147-49.  In the instant case, however, Thomas engaged in conduct which was traditionally found not to be protected under the First Amendment.  It would not be splitting hairs for a reasonable official to believe that a police officer complaining about his superior's work-related conduct to the Board of Selectmen while the Board was overseeing an investigation into the police department was not protected under Garcetti.  Harrington is entitled to qualified immunity for his actions, if any, taken in response to Thomas' report regarding Sullivan's conduct.

### D.     Liability of the Town

Thomas does not make any claim that the Town should be liable for violating his First Amendment rights that is distinct from his claims against Harrington.  Where, as here, the

governmental official "has inflicted no constitutional harm," the Town cannot be held liable either.  Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002).  See also Eaton v. Harsha, 505 F. Supp. 2d 948, 973-74 (D. Kan. 2007) (where police chief did not violate officer's First Amendment rights in disciplining them for making certain statements, claims against municipality must be dismissed).  Therefore, summary judgment shall enter in favor of the Town on Count I of the Complaint as well.

### E.    State Law Claims

The remaining claims of Thomas' Complaint are all state law claims.  In its recent decision in Wilber v. Curtis, the First Circuit questioned whether the federal court should exercise its supplemental jurisdiction over state law claims when it dismissed the only federal claim (brought pursuant to 42 U.S.C. § 1983) on summary judgment.  See Wilber v. Curtis, 2017 WL 4159603, at *6.  Therefore, this court will defer ruling on the defendants' motion for summary judgment as to the remaining Counts of the Complaint.

### IV.  CONCLUSION

For the reasons detailed herein, the Defendants' Motion for Summary Judgment (Docket No. 70) is ALLOWED as to Count I, the alleged violation of Thomas's First Amendment rights.  Since this is the only federal law claim, a status conference will be held to discuss whether the remaining state law claims should be remanded to the state court

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[24]