UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARK THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 14-13726-JGD |
| TOWN OF SALISBURY, CORNELIUS J. | ) | |
| HARRINGTON a/k/a "NEIL" HARRINGTON, | ) | |
| and ROBERT ST. PIERRE, | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

January 3, 2018

DEIN, U.S.M.J.

### I. INTRODUCTION

The plaintiff, Mark Thomas, was a police officer with the Town of Salisbury, Massachu-

setts.  He brought this action alleging numerous violations of his constitutional and state law

rights in connection with an internal investigation brought against him, his resulting termina-

tion as a police officer, and his subsequent reinstatement.  Following this court's ruling on

various motions to dismiss, the remaining defendants were the Town of Salisbury and its Town

Manager, Cornelius (Neil) Harrington, and, on a limited basis, Robert St. Pierre, who had been

hired to investigate Thomas, and whose investigation of the plaintiff had led to the termination

of his employment with the Salisbury Police Department.[1]

---

[1] The Town, Harrington and St. Pierre are collectively referred to as the "Remaining Defendants."

On September 30, 2017, this court issued a Memorandum of Decision and Order allowing the Remaining Defendants' motion for summary judgment on Count I, in which Thomas had alleged a violation of First Amendment rights by the Town and Harrington. (See Docket No. 92). Since this was the only federal law claim remaining in the case, this court held a status conference to discuss whether the remaining state law claims should be remanded to the state court in light of Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017) ("the Supreme Court has instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 619 n.7, 98 L. Ed. 2d 720 (1988))).

At the status conference, all parties requested that this court retain jurisdiction over this case and decide the Remaining Defendants' motion for summary judgment as to the state law claims. In particular, but without limitation, the parties all agreed that given the age of the case, this court's numerous substantive rulings and consequent familiarity with the complex procedural and factual record, and the straightforward nature of the state law claims, judicial economy, convenience, fairness and comity warrant this court's retention of jurisdiction. This court agrees. Therefore, in this Supplemental Memorandum of Decision and Order this court will address the remaining state law claims, namely Count V (civil conspiracy against Harrington and St. Pierre); Count VII (violation of Mass. Gen. Laws ch. 12, § 11I - the Massachusetts Civil Rights Act against Harrington); Count VIII (intentional infliction of emotional distress against

Harrington); Count IX (intentional interference with contractual relations against Harrington); and Count X (interference with advantageous business relations against Harrington). For all the reasons detailed herein, the Remaining Defendants' motion for summary judgment as to the state law claims is ALLOWED.

## II. <u>STATEMENT OF FACTS</u>[2]

This decision will assume familiarity with this court's prior decisions on the various motions to dismiss (Docket Nos. 48-50), as well as on the Remaining Defendants' motion for summary judgment (Docket No. 92). The following facts are derived substantially from the summary judgment decision, and are limited to the facts relevant to the issues remaining before this court. In addition, the facts are viewed in the light most favorable to the non-moving party, Thomas. <u>Tobin v. Fed. Express Corp.</u>, 775 F.3d 448, 450 (1st Cir. 2014).

### <u>Background</u>

Thomas became a police officer with the Town of Salisbury in the 1980s. (Compl. (Docket No. 1) at 16, 19). In early 2006, the Town Manager, Neil Harrington, put together a four-person Screening Committee to screen the applicants for a new Chief of Police for the Town. (DF ¶ 6). Harrington was a member of the Committee, as was Thomas. (<u>Id.</u>). The

---

[2] Unless otherwise indicated, the facts are derived from the Defendants' Local Rule 56.1 Concise Statement of Material Facts ("DF") (Docket No. 73); Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts ("PR") (Docket No. 81); Plaintiff's Counterstatement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("PF") (Docket No. 81 beginning at ¶ 100); and Defendants' Responses to Plaintiff's Counterstatement ("DR") (Docket No. 87). All of these facts have been combined in a filing by the defendants entitled "Consolidated Statement of Material Facts" (Docket No. 87). The defendants' exhibits ("Defs. Ex. ___") are found at Docket Nos. 74 and 75 and the plaintiff's exhibits ("Pl. Ex. ___") are found at Docket No. 81.

Screening Committee unanimously recommended David L'Esperance.  (DF ¶ 7).  Harrington

hired L'Esperance as the Chief of Police in April 2006.  (DF ¶ 10).  In accordance with the Town

Charter, L'Esperance's contract was verified by the Board of Selectmen.  (Id.).  On, or soon after,

his first day on the job, L'Esperance appointed Thomas to the position of Detective.  (DF ¶ 12).

It is Thomas' contention that this appointment, as well as his rising status in the Department,

caused much jealousy among his fellow officers.  (PR ¶ 12).

### The L'Esperance Investigation

In the Fall of 2010, two Salisbury Police Officers, Tony King and Steven Sforza, learned of

certain alleged misconduct involving Chief L'Esperance, which they brought to the attention of

the Executive Officer, Kevin Sullivan.  (DF ¶ 20).  Sullivan, in turn, brought this information to

the attention of Harrington.  (Id.).  Harrington placed L'Esperance on Administrative Leave on

December 5, 2010, and appointed Sullivan as the Acting Police Chief.  (DF ¶ 21).  On or about

December 9, 2010, Harrington, on behalf of the Town, entered into a contract with Robert St.

Pierre, effective December 1, 2010, to conduct an investigation into the charges against

L'Esperance.  (DF ¶ 23; PR ¶ 23).  Harrington had worked with St. Pierre in Salem, Massachu-

setts, where Harrington had been the Mayor and St. Pierre had been the Chief of Police.  (DF

¶¶ 7, 15).

On December 27, 2010, the Board unanimously renewed Harrington's employment as

Town Manager.  (DF ¶ 31).  On January 11, 2011, Harrington sent L'Esperance a letter, copy to

the Board of Selectmen, advising him that St. Pierre had been hired to conduct an administra-

tive review of the allegations of misconduct that had been made against him, and advising

L'Esperance that he would be interviewed by St. Pierre on January 13, 2011.  (DF ¶ 32).  During the course of the L'Esperance investigation, St. Pierre interviewed 14 officers and civilian employees of the Police Department.  (DF ¶ 36).  On January 18, 2011, L'Esperance tendered his resignation from the Salisbury Police Department.  (DF ¶ 37).  On January 24, 2011, St. Pierre turned in his investigative report concerning L'Esperance to Harrington (and the Board).  (See DF ¶ 38).  Therein, St. Pierre concluded that he would have recommended the immediate dismissal of L'Esperance if he had not already resigned.  (Id.).

As noted above, with L'Esperance under investigation, Sullivan was serving as the Acting Chief of Police.  Thomas and Sullivan had a negative history and it did not improve.  For example, Sullivan issued a reprimand against Thomas, which was later rescinded.  (See DF ¶¶ 44-47; PR ¶ 44).  Harrington was advised by Sullivan of the reprimand as it was happening.  (See PR ¶ 45).

## Allegations Against Thomas

The L'Esperance Report also contained allegations against Thomas.  (PR ¶ 38).  In particular, these allegations included that Thomas had studied for the Bar Exam while on the job, that Thomas had witnessed L'Esperance pilfering evidence at crime scenes, and that Thomas had conspired with L'Esperance to create a false resume for submission to the FBI that included Thomas' designation to the position of Chief of Detectives.  (PF ¶ 114).[3]  On January

---

[3] At the completion of the L'Esperance investigation, there were no witnesses stating that Thomas had been seen studying on the job, and Thomas had told St. Pierre that L'Esperance had, in fact, designated Thomas as Chief of Detectives.  (PF ¶ 114).  Thomas contends that other officers had also seen L'Esperance pilfering items from crime scenes.  (Id.).

24, 2011, St. Pierre gave a summary of his Report to the Board of Selectmen meeting in an

Executive Session.  (DF ¶ 39).  On either that day and/or on February 14, 2011, the Board asked

Harrington to ask St. Pierre to conduct an investigation into certain "loose ends" with respect to

L'Esperance, and to conduct an investigation into the allegations made against Thomas during

the L'Esperance investigation.  (DF ¶ 58; PR ¶ 58; DF ¶ 59).  Thomas was aware of the decision

to investigate him by no later than February 14, 2011, and he knew that the investigation would

be conducted by St. Pierre, over Thomas' objection that the investigation should be done

internally by a superior officer.  (See DF ¶ 60).

### Thomas' Letter to the Board of Selectmen

On February 24, 2011, Thomas provided a so-called "whistle-blower" letter to the

Chairman of the Board of Selectmen, reporting sexual harassment claims against Sullivan.  (DF

¶ 48).  Therein, Thomas purported to disclose information provided by female officers to

another male officer who, in turn, disclosed it to Thomas.  (Def. Ex. H).  As detailed above, by

the time Thomas provided the letter to the Board, he was aware that the Board had decided

that his conduct would be investigated by St. Pierre.  It is Thomas' contention that while the

Board's initial decision to conduct an investigation into Thomas may have been legitimate,

given the issues that had come up during the L'Esperance investigation, the "flawed and rigged

investigation" that allegedly took place, "with pre-determined results, was conducted in

retaliation for Thomas' disclosure of Sullivan's improprieties approximately a week prior to the

commencement of the formal Thomas Investigation."  (Pl. Opp. (Docket No. 80) at 3 (Thomas

"does not propose that the Board's suggestion that an investigation may be appropriate was, in and of itself, retaliatory . . . .").[4]

The Chairman of the Board of Selectmen gave a copy of Thomas' letter to Harrington. (DF ¶ 48). Unbeknownst to Thomas, in or about mid-February 2011, Officer McNeil had approached Harrington and also told him about allegations of sexual harassment concerning Sullivan. (PR ¶ 48). Harrington had acknowledged the complaint, but said that he would "sit on it" for now, and did not report it to any Selectman. (Id.).

Thomas' charges, however, resulted in further investigation. Thus, a few days later, on February 28, 2011, Harrington told Thomas that, in accordance with the Town's sexual harass-ment policy, and after consulting with counsel, a confidential investigation into the charges of sexual harassment by Sullivan would take place beginning that week. (DF ¶ 49). Harrington reported the same to the Board of Selectmen on February 28, 2011 as well. (DF ¶ 50). In fact, on the same day Harrington, on behalf of the Town, hired Lt. Mary Butler from the Salem Police Department to conduct the investigation. (DF ¶ 51).

Sullivan retired from the Salisbury Police Department on March 1, 2011, effective immediately. (DF ¶ 52). Richard Merrill was appointed Acting Police Chief by Harrington. (Id.). Lt. Butler submitted her investigative report about Sullivan to Harrington on May 23, 2011. (DF ¶ 53). Harrington advised the Board of Selectmen that the investigation had been completed

---

[4] Count I of Thomas' Complaint was based on his contention that he was retaliated against for pre-senting this whistle-blower letter, in violation of his First Amendment rights. This court granted the defendants' motion for summary judgment on Count I on the basis that the letter was not protected speech, and that even if it was, Harrington was entitled to qualified immunity. (Docket No. 92 at 12-23).

on June 9, 2011, and Thomas was similarly informed by Acting Chief Merrill on June 22, 2011. (DF ¶¶ 54, 55).

### The Investigation of Thomas

Meanwhile, on the same day that he hired Lt. Butler to investigate Sullivan, February 28, 2011, Harrington, on behalf of the Town, entered into a contract with St. Pierre to conduct an investigation and render a report concerning the allegations of misconduct involving Thomas which had surfaced during the L'Esperance investigation. (See DF ¶ 63). The investigation continued for months, during which Acting Chief Merrill placed Thomas on paid Administrative Leave, beginning on May 24, 2011. (DF ¶ 64). Thomas contends that the investigation was improper and biased, and that the results were pre-determined. This is strenuously denied by Harrington and St. Pierre.

A careful and complete reading of the record in this case leads to the conclusion that while the basic facts relating to the investigation are not in dispute, there is a sharp dispute as to the significance of the events and as to the parties' motivations. Reading the record in the light most favorable to Thomas, a fact-finder may conclude that Harrington wanted to remove Thomas from his employment with the Salisbury Police Department even before the investigation began.[5] In addition, there is evidence that Harrington and St. Pierre were in frequent

---

[5] For example, as the Arbitrator found, Thomas was charged with conduct for which other officers had not been charged, and which, in any event, had been authorized by Thomas' then superior officer, L'Esperance. (See, e.g., Pl. Ex. 42 at 17, 21-22, 26-29/36). Thus, the fact-finder may conclude that Harrington could have elected not to discipline Thomas even if he engaged in the charged conduct.

communication during the investigation.  (See, e.g., PR ¶ 71).[6]  There is also evidence from

which a fact-finder may conclude that St. Pierre encouraged officers to disclose any negative

information that they might have about Thomas.  (See, e.g., PF ¶ 112).  However, despite

Thomas' challenges to the veracity of the information other officers provided about him, there

is no evidence that Harrington or St. Pierre encouraged any of the officers to lie, or that they

suborned perjury, or that Harrington or St. Pierre knowingly relied on false testimony.

St. Pierre provided Harrington with a draft of his findings and recommendations

concerning his investigation of Thomas on August 1, 2011.  (PR ¶ 77).  St. Pierre concluded that

Thomas had engaged in misconduct that warranted his discharge from the Salisbury Police

Department.  (DF ¶ 78).  Harrington made various changes to the draft report, which did not

alter St. Pierre's conclusions.  (PR ¶ 79).[7]  In his final report, St. Pierre concluded that Thomas

had engaged in conduct unbecoming an officer by studying for the July 2007 and February 2008

---

[6] In this court's view, assuming Harrington wanted Thomas to be removed as a police officer, the most
likely explanation could be that Thomas' ties to the discredited L'Esperance may have caused Harrington
concern.  This is evidenced by Harrington's position during Thomas' termination proceeding to the effect
that Thomas should have rejected various directives given to him by L'Esperance, and that Thomas and
L'Esperance colluded to falsify Thomas' credentials.  (See, e.g., Pl. Ex. 42 at 8-9/36).  This court
acknowledges Thomas' contention that his letter to the Board of Selectmen was a motivating factor in
Harrington's efforts to have Thomas removed from his employment.  This argument appears to this
court to be inconsistent with the overall chronology of events, including that the investigation of
Thomas was approved before the letter was sent.  Moreover, other than Thomas' own beliefs, there
does not seem to be any record support for this theory.  In any event, the issue does not need to be
resolved here.  Regardless of the reason, this court will assume, for purposes of this summary judgment
decision, that Harrington wanted to build a record to have Thomas removed as a police officer.

[7] According to Thomas, "Harrington removed an exculpatory statement by Thomas and further removed
several of St. Pierre's rather tenuous suppositions regarding what transpired based on his analysis of the
evidence."  (Pl. Opp. at 22).  However, there is no evidence that any of the changes altered the sub-
stance of St. Pierre's report, or caused St. Pierre to change his recommendation.  (See DF ¶ 79; PR ¶ 79;
PF ¶ 127; DR ¶ 127).

Bar Examinations while on duty, wrongfully denying that there had been prior disciplinary action taken against him and embellishing his credentials by claiming to be a Chief of Detectives in connection with an application to the FBI Academy, interfering with an Internal Affairs investigation into his alleged wrongdoing, and failing to disclose Chief L'Esperance's misappropriation of property from crime scenes and attempting to cover up for L'Esperance. (See Pl. Ex. 42 at 6/36). Harrington, after consultation with counsel, provided a copy of the Thomas Report to the Board of Selectmen the same day. (DF ¶ 80). Harrington also provided a copy of the Report to the Newburyport Daily News, and a copy, which may have been sent by Harrington, went to the Board of Bar Overseers as well. (PR ¶ 80; PF ¶ 129). There is evidence that the Report was given to the newspaper in response to a request by the paper under the Freedom of Information Act ("FOIA"). (Pl. Ex. 41; DR ¶ 129).

On September 28, 2011, Harrington advised Thomas that he intended to hold a disciplinary hearing against Thomas in accordance with the Civil Service laws. (DF ¶ 81). Although originally scheduled for October 11, 2011, it was continued and eventually held on December 15, 2011. (DF ¶¶ 81, 82). The Police Department did not put on any witnesses, relying instead on St. Pierre's Report. (DF ¶ 82; PR ¶ 82). Thomas was represented by counsel. (Def. Ex. V). A second date was scheduled to allow Thomas to testify, but he ultimately elected not to do so. (DF ¶ 82; PR ¶ 82). On February 8, 2012, Harrington issued his decision in which he upheld two of the charges and dismissed two others. (DF ¶ 83). In particular, Thomas was found to have studied for the February 2008 Bar Examination while on duty, and to have made false representations in his application to the FBI Academy, including falsely representing himself as being

Chief of Detectives and failing to disclose a prior discipline finding against him. (Pl. Ex. 42 at 6-7/36). Thomas was not disciplined for having witnessed L'Esperance pilfer evidence at crime scenes, which other officers had witnessed as well. (DF ¶ 83). Thomas' employment with the Salisbury Police Department was terminated. (Id.).

The Union represented Thomas in an Arbitration proceeding addressing the issue whether there was just cause to terminate Thomas' employment. (DF ¶ 85). The Arbitrator heard testimony from several witnesses and took evidence. (See Pl. Ex. 42). On October 31, 2012, the Arbitrator issued a decision, finding that the Town did not have just cause to terminate Thomas, and ordered that Thomas be reinstated to his prior position with back pay. (DF ¶ 86). As all of the parties recognize, the Arbitrator's findings, rulings and conclusions are not binding on this court, and they will not be adopted herein. However, this court does find it significant that a review of the Arbitrator's decision shows that there was evidence in the record to support Harrington's findings, and that the Arbitrator did not find that St. Pierre or Harrington had fabricated any evidence. (See Pl. Ex. 42 at 15-30/36).[8]

---

[8] The Arbitrator, after reviewing the evidence, concluded, inter alia, that L'Esperance had authorized Thomas to study for the Bar Exam while on duty, but also that "based on the application of the preponderance of the evidence standard, it is more likely than not that the grievant did not study for the February, 2008 Bar Examination while on-duty." (Pl. Ex. 42 at 22/36). He also concluded that L'Esperance authored Thomas' curriculum vitae and letter for the FBI Academy in which Thomas was referred to as "Chief of Detectives" and that L'Esperance had given him that unofficial title. (Id. at 25-27/36). Finally, he concluded that the Town had not followed proper procedures in connection with an alleged disciplinary complaint from when Thomas was a Reserve Intermittent Police Officer, as a result of which it was appropriate for Thomas to tell the FBI that he had no disciplinary record. (Id. at 31-32/36; see generally PR ¶ 86 (summarizing Arbitrator's decision)).

Thomas returned to the Salisbury Police Department on December 12, 2012.  (DF ¶ 87).

Thomas was paid the amounts due to him.  (DF ¶ 88).  According to Thomas, when he returned

to work, Chief Thomas Fowler (who by then had replaced Acting Chief Merrill) told him that

many of the officers did not want him back.  (PR ¶ 87).  Thomas also claims that he was

prevented from practicing law despite the fact that others were permitted to "moonlight" at

other jobs.  (Id.; DR ¶ 132).  Thomas contends that Harrington was aware of this allegedly

improper ban on his employment as an attorney.  (Id.).  For his part, Harrington contends that

Fowler would have permitted Thomas to practice law if conflict of interest issues had been

resolved.  (DR ¶ 132).

Eventually, Thomas felt he was unable to work as he was in fear for his life, and was put

on long term sick leave.  (DF ¶¶ 92-93).  He was eventually retired on a disability.  (DF ¶¶ 94-

98).  He also received accidental disability benefits.  (PF ¶ 99).  Thomas contends that even after

his separation from the Police Department, Harrington continued to harass him by interfering

with the sale of his home.  In particular, Thomas alleges, and Harrington denies, that while

Thomas' house was under agreement to be sold, Harrington contacted the Salisbury building

inspector and asked him to investigate whether Thomas' home was illegally being used as a

two-family residence.  (PF ¶ 134; DR ¶ 134).  According to Thomas, his "house did not sell due

to the actions of Salisbury's agents, particularly, the building inspector."  (PF ¶ 134).[9]

Additional facts will be provided below where appropriate.

---

[9]  There is no evidence as to whether such a concern about improper use was a legitimate concern.  Nor
are there other facts in the record regarding the potential sale and why it fell through.

### III.  ANALYSIS

#### A.    Standard of Review – Summary Judgment

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted).  The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court affords "no evidentiary weight to conclusory

[13]

allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotation marks and citation omitted). Rather, "[w]here, as here, the nonmovant bears the burden of proof on the dispositive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Id. (citation omitted).

Applying these principles to the instant case compels the conclusion that the Remaining Defendants' motion for summary judgment must be ALLOWED.

**B.** **Count V – Civil Conspiracy**

In Count V of his Complaint, alleging a claim of civil conspiracy, Thomas contends that "Harrington and St. Pierre acted in concert to inflict a wrong on Thomas by, among other things, initiating and orchestrating a flawed and biased investigation of Thomas." (Compl. ¶ 239). For the reasons detailed herein, this court finds that the defendants are entitled to summary judgment on this claim.

Thomas is proceeding on a "concerted action" theory of civil conspiracy. (See Pl. Opp. at 20 (citing Kyte v. Philip Morris Inc., 408 Mass. 162, 166-67, 556 N.E.2d 1025, 1027 (1990)). Under this theory, premised on the Restatement (Second) of Torts § 876(b) (1977), a person may be liable in tort if he "knows that the conduct of another person constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Kurker v. Hill, 44 Mass. App. Ct. 184, 189, 689 N.E.2d 833, 837 (1998) (internal punctuation omitted). "Key to this cause of action is a defendant's substantial assistance, with the

[14]

knowledge that such assistance is contributing to a common tortious plan." Id. "In the tort field, the doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Stock v. Fife, 13 Mass. App. Ct. 75, 82 n.10, 430 N.E.2d 845, 849-50 n.10 (1982). In the instant case, the record does not support a finding that the defendants participated in a "tortious plan" or that St. Pierre provided "substantial assistance" to Harrington, the ultimate decision maker, in furtherance of wrongful conduct.

Despite Thomas' characterization of the investigation as being "flawed and biased," at the conclusion of discovery there is no evidence that St. Pierre or Harrington distorted the evidence that was presented during St. Pierre's investigation, suborned perjury, or otherwise fabricated the facts uncovered during the investigation.[10] Even assuming that Harrington wanted St. Pierre to find evidence that would support Thomas' termination (a fact which is disputed), there is no support for a finding that the evidence was manipulated in any way. The most that can be said is that St. Pierre kept digging for evidence against Thomas when it wasn't otherwise easy to find.

Similarly, while the record may support a finding that St. Pierre and Harrington communicated throughout the investigation of Thomas, it does not support a finding that they

---

[10] Thomas' complaint, fundamentally, is that St. Pierre and Harrington should not have believed the officers who provided evidence against Thomas (presumably because they were jealous of him) and should have believed Thomas. The plaintiff has not cited any cases, nor have any been found, where misjudging the credibility of a witness, in and of itself, constitutes a basis for tort liability.

wrongfully conspired for an improper purpose. The evidence remains uncontroverted that Harrington alone made the decision to terminate Thomas' employment. There is no evidence that St. Pierre "conspired" to assist him other than by doing the job he was hired to do — namely, investigate the charges against Thomas. The evidence is that St. Pierre conducted an investigation that was authorized by the Board of Selectmen. He issued a report disclosing his findings and reasoning. Thomas was given his right to object to these findings. Harrington held a hearing at which Thomas was represented by counsel, but elected not to present substantive evidence or to testify on his own behalf.[11] Harrington followed the Civil Service rules and afforded Thomas all the rights to which he was entitled. Harrington issued a report in which he, too, fully disclosed the basis for his termination decision. Even if St. Pierre erred in deciding which witnesses to believe, and Harrington wrongfully concluded that the record supported the termination decision, there is no evidence that they conspired together in furtherance of a tortious plan. The defendants are entitled to summary judgment on the claim for civil conspiracy. See Tracey v. Champeon, 91 Mass. App. Ct. 1106, 79 N.E.3d 1111 (Table), 2017 WL 633778, at *3 (Mass. App. Ct. Feb. 16, 2017) (unpub. op.) (motion to dismiss allowed where police officer failed to establish concerted action by town officials, all of whom had participated in the investigation and disciplinary action brought against the officer, which was eventually reversed by an arbitrator).

---

[11] Although the record is not clear, it does not appear that Thomas, who was represented by counsel, called any witnesses other than Chief Sullivan, or proffered any evidence to rebut St. Pierre's report. (See Def. Ex. V).

**C. Count VII – Violation of Mass. Gen. Laws ch. 12, § 11I –
The Massachusetts Civil Rights Act**

In Count VII, Thomas alleges that Harrington is liable under the Massachusetts Civil

Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I, for attempting to force him to resign from

his employment.  In support of this claim, Thomas argues that there is evidence

> demonstrating that the sham Thomas investigation (orchestrated by
> Harrington) and the further actions of Harrington, including Harrington's
> surreptitious dissemination of the Thomas Report (immediately upon its
> completion) to the press and the sham termination hearing itself (in
> which Salisbury presented no witnesses), all were done to exert
> enormous pressure on Thomas (and did exert such pressure) to force
> Thomas to leave his employment with Salisbury.
>
> In other words, Harrington's threats (as stated above) were an attempt
> to "interfere" with Thomas' protected rights (his "right to continued
> employment").  As such, this count should stand.  Simply put,
> Harrington's "intentional exertion of pressure" made Thomas so "fearful
> or apprehensive of injury or harm" that he contemplated quitting his
> position.  Harrington "attempted" to force out Thomas.

(Pl. Opp. at 24-25 (record citations omitted)).[12]

"To establish a claim under the MCRA, a plaintiff must prove 1) his exercise or enjoy-

ment of his rights secured by the Constitution or the laws of either the United States or the

Commonwealth have been subjected to interference or <u>attempted interference</u> by the defen-

dants and 2) that the interference or <u>attempted interference</u> was by 'threats, intimidation or

coercion.'"  <u>Carroll v. City of Quincy</u>, 441 F. Supp. 2d 215, 226 (D. Mass. 2006) (emphasis added)

(quoting <u>Bally v. Ne. Univ.</u>, 403 Mass. 713, 717, 532 N.E.2d 49, 51–52 (1989)).  These

---

[12]  Thomas does not contend that the actual termination of his employment (which followed all
applicable due process procedures) violated the MCRA.

requirements "are 'coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not.'"  Id. (quoting Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23, 473 N.E.2d 1128, 1131 (1985)).  In addition, the MCRA action requires proof that the defendants used "threats, intimidation or coercion."  At issue is whether this latter element is missing in the instant case.

The Massachusetts Supreme Judicial Court has defined the words "threats, intimidation or coercion" as follows:

> "Threat" ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. ["Coercion" is] "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

Ali v. Univ. of Mass. Med. Ctr., 140 F. Supp. 2d 107, 110 (D. Mass. 2001) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, 631 N.E.2d 985, 990 (1994)) (alteration in original); see also Mancuso v. Mass. Interscholastic Athletic Ass'n, Inc., 453 Mass. 116, 131, 900 N.E.2d 518, 531 (2009). Therefore, violations of the MCRA typically involve "actual or potential physical confrontation accompanied by a threat of harm[.]"  Planned Parenthood League of Mass., Inc., 417 Mass. at 473, 631 N.E.2d at 989.  Nevertheless, economic coercion, standing alone, may be actionable under the MCRA.  Buster v. George W. Moore, Inc., 438 Mass. 635, 647-48, 783 N.E.2d 399, 411 (2003).  That having been said, "the exception for claims based on non-physical coercion remains a narrow one."  Nolan v. CN8, 656 F.3d 71, 78 (1st Cir. 2011) (quotation omitted).

In the instant case, Thomas has conceded that it was not inappropriate for Harrington to commence the investigation once the allegations of wrongdoing surfaced during the L'Esperance investigation. The fact that the ongoing investigation caused Thomas stress does not rise to the level of a constitutional violation, even if it caused Thomas to consider leaving his job.[13] As detailed above, neither St. Pierre nor Harrington fabricated evidence or otherwise engaged in wrongdoing in connection with the investigation. The fact that the plaintiff successfully challenged the disciplinary action imposed on him does not render the disciplinary process a violation of the MCRA. See Tracey, 2017 WL 633778, at * 2 (court rejects police officer's contention he suffered economic coercion under the MCRA as a result of his suspension during an internal investigation, even though the city's imposition of disciplinary punishment was reversed by an arbitrator).

**D.      Count VIII – Intentional Infliction of Emotional Distress**

In Count VIII of the Complaint, Thomas alleges a claim against Harrington for intentional infliction of emotional distress. After the completion of discovery, the plaintiff has failed to meet the "very high" standard necessary to establish this claim. See Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996).

In order to establish a claim for intentional infliction of emotional distress, Thomas must show "(1) that the actor intended to inflict emotional distress or that he knew or should have

---

[13] Thomas also challenges the publication of the Report against him as evidence of a violation of his constitutional rights. This argument, however, is not developed. Moreover, it appears from the record that the Report was provided in response to a FOIA request. (See DF ¶ 80; PR ¶ 80; Pl. Ex. 41). Since the record is devoid of any legal argument that the publication was wrongful, it cannot serve as a basis of a threat, intimidation or coercion.

known that emotional distress was the likely result of his conduct; (2) that the conduct was

'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly

intolerable in a civilized community'; (3) that the actions of the defendant were the cause of

the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was

'severe.'" Howell v. Enter. Publ'g Co., LLC, 455 Mass. 641, 672, 920 N.E.2d 1, 28 (2010) (quoting

Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315, 318-19 (1976)) (additional

citations and internal punctuation omitted).  "To be considered extreme and outrageous, the

defendant's conduct must be beyond all bounds of decency and utterly intolerable in a civilized

community.  Liability cannot be founded upon mere insults, threats, or annoyances." Howcroft

v. City of Peabody, 51 Mass. App. Ct. 573, 596, 747 N.E.2d 729, 747 (2001) (quoting Cady v.

Marcella, 49 Mass. App. Ct. 334, 340-41, 729 N.E.2d 1125, 1131 (2000)) (additional citations

and internal punctuation omitted).  Similarly, as the SJC has explained:

> liability cannot be predicated upon "mere insults, indignities, threats,
> annoyances, petty oppressions, or other trivialities," nor even is it
> enough "that the defendant has acted with an intent which is tortious or
> even criminal, or that he has intended to inflict emotional distress, or
> even that his conduct has been characterized by 'malice,' or a degree of
> aggravation which would entitle the plaintiff to punitive damages for
> another tort"; rather, "[l]iability has been found only where the conduct
> has been so outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency, and to be regarded as atrocious,
> and utterly intolerable in a civilized community."

Foley v. Polaroid Corp., 400 Mass. 82, 99, 508 N.E.2d 72, 82 (1987) (quoting Restatement

(Second) of Torts § 46, comment d (1965)).

Thomas relies on the following arguments in support of this claim:

[20]

> ... Harrington's sham investigation and the sham termination hearing of Thomas are not the only conduct that was extreme and outrageous. Harrington also leaked the Thomas Report to the press immediately upon its completion; Harrington anonymously reported Thomas to the Bar Overseers; Harrington was intimately involved in Fowler's prohibition of Thomas' ability to practice law while a Salisbury officer; and Harrington purposely intervened in the recent attempted sale of Thomas' residence, causing the sale to fall apart. The motivation for these actions is simply unexplainable, unless Harrington wished to cause Thomas distress.

(Pl. Opp. at 27). In further support of his contention that Harrington acted with animus, Thomas argues that "Harrington was angry at Thomas for his disclosure of Sullivan's improprieties, and that Thomas would subsequently be in the eye of the storm." Id.[14] As detailed more fully above, Thomas' argument is premised on disputed facts, or on conclusory allegations that are otherwise not supported by the record. Nevertheless, for purposes of this motion for summary judgment, this court will view the record in the light most favorable to the plaintiff. A most liberal reading of the record establishes that Harrington may have wanted Thomas gone, and may have encouraged St. Pierre to dig deep for facts against Thomas, but Harrington followed all Civil Service rules, explained his decision and allowed Thomas to fully respond to the charges against him. Thomas had counsel at his so-called "sham" hearing and elected not to testify. Harrington's other alleged actions, which are disputed, may have been irritating but are not illegal or otherwise gratuitously harmful. The record simply does not support a finding of intentional infliction of emotional distress.

---

[14] Given that Thomas' "disclosure of Sullivan's improprieties," i.e., his so-called whistle-blower letter, consisted of Thomas reporting about events purportedly told to another police officer, and about which Thomas had no personal knowledge, it is hard to see how Thomas was likely to be "in the eye of the storm."

**E.**     **Count IX – Intentional Interference with Contractual Relations**
          **Count X –Interference with Advantageous Business Relations**

In Counts IX and X, Thomas alleges that Harrington interfered with his contractual and advantageous business relations with the Town by causing the Town to terminate his employment as a police officer, in violation of his Union Collective Bargaining Agreement.

"To establish a claim of intentional interference with contractual relationship, [Thomas] must show (1) that he had a contract with a third party, (2) that the defendants knowingly induced the third party to break that contract, (3) that the defendants' interference was improper in means or motive, and (4) that [Thomas] was harmed by the interference." Cachopa v. Town of Stoughton, 72 Mass. App. Ct. 657, 660, 893 N.E.2d 407, 411 (2008), and cases cited. Similarly, "[t]o make a successful claim for intentional interference with advanta-geous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Blackstone v. Cashman, 448 Mass. 255, 260, 860 N.E.2d 7, 12-13 (2007). When officials, such as Harrington, are acting "within the scope of their employment responsibilities," they can only be held liable under these theories if "their actions are motivated by actual, and not merely implied, malice[.]" Id. at 260-61, 860 N.E.2d at 13. "[A]ctual malice" in these circumstances is defined as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." Id. at 261, 860 N.E.2d at 13 (quotation and citation omitted).

For the reasons detailed above, the record does not support the conclusion that Harrington acted with actual malice. Harrington did not cause Thomas' name to come up in the L'Esperance investigation, and Harrington did not falsify evidence or otherwise prevent witnesses from sharing their information (positive or negative) during the investigation. Harrington afforded Thomas all of his due process rights. While Thomas may (and did) legitimately challenge the merits of the termination decision, he has not met his burden of establishing that Harrington acted for a malignant purpose unrelated to Harrington's responsibilities in connection with the legitimate interests of the police department.

### IV. <u>CONCLUSION</u>

For the reasons detailed herein, the Defendants' Motion for Summary Judgment (Docket No. 70) is ALLOWED as to the remaining counts of the complaint.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[23]